FIREMAN'S FUND INSURANCE
COMPANY, Plaintiff,

v.

ST. PAUL FIRE & MARINE INSUR-
ANCE COMPANY and Travelers In-
demnity Company, Defendants.

Steven Cohen Productions, Ltd., and
St. Paul Fire and Marine Insurance
Company, Plaintiffs,

v.

Lucky Star, Inc., Defendant.

Civil Action No. 3:12–cv–0851
No. 3:16–cv–0641

United States District Court,
M.D. Tennessee, Nashville Division.

Filed April 19, 2016

Anthony Dipietra, Gene A. Weisberg, Leon Gladstone, Gladstone Weisberg, ALC, Los Angeles, CA, Edward Jason Ferrell, Gordon C. Aulgur, Brewer, Krause, Brooks, Chastain & Burrow, Nashville, TN, for Plaintiff.

Brent S. Usery, Marc O. Dedman, Spicer Rudstrom, PLLC, Nashville, TN, for Defendants.

### MEMORANDUM OPINION

KEVIN H. SHARP, Chief Judge, United States District Court

Before the Court in this consolidated action are three motions: the motion for summary judgment filed by plaintiffs Steven Cohen Productions, Ltd. ("SCP") and St. Paul Fire & Marine Insurance ("St. Paul") in June 2015 in *Steven Cohen Productions, Ltd. v. Lucky Star, Inc.*, No. 3:16–cv–0641 (ECF No. 79) (the "Nevada Action") when that action was still pending in the United States District Court for the District of Nevada; the motion for summary judgment filed by defendants St. Paul and Travelers Indemnity Company in February 2015 in *Fireman's Fund Insurance Co. v. St. Paul Fire & Marine Insurance Co.*, No. 3:12-cv-0851 (the "Declaratory Judgment Action"); and the motion for summary judgment filed in February 2015 by plaintiff Fireman's Fund Insurance Company ("Fireman's Fund"), also in the Declaratory Judgment Action. The Nevada Action was transferred to this district effective March 23, 2016 and reassigned to the undersigned on March 31, 2016. The two actions were consolidated by order entered on April 12, 2016 (ECF No. 129).[1] The parties will be referred to herein by name or initials rather than by party designation, in an attempt to avoid unnecessary confusion.

All the summary-judgment motions have been fully briefed and are ripe for review. The record is replete with statements of facts, responses to statements of facts, additional facts, responses to the additional facts, and numerous declarations, affidavits, depositions and deposition excerpts in support of the parties' statements. Also in the record are a set of joint stipulations and copies of all the written contracts that are or might be relevant to the resolution of this case.

For the reasons set forth herein, the motions filed by SCP and St. Paul will be granted, and the motion filed by Fireman's Fund will be denied in its entirety.

## I. STATEMENT OF UNDISPUTED FACTS

Although the parties dispute how to interpret some of the facts, the actual facts themselves are basically undisputed.

On August 13, 2011, the country music band Sugarland was about to perform an outdoor concert at the Indiana State Fairgrounds in Indianapolis. Just before Sugarland was scheduled to go on stage, fifty-mile-per-hour wind gusts from an approaching thunderstorm hit the stage, causing the temporary roof structure to collapse. The "Stage Collapse," as the parties refer to the incident, resulted in several deaths and injuries to spectators. The personal injuries are not the subject of this lawsuit. The Stage Collapse also caused the destruction of equipment used by Sugarland in its concerts. The Nevada Action is a breach of contract action between the insured parties regarding liability for the damage to the equipment caused by the Stage Collapse. The Declaratory Judgment Action was filed to settle a dispute between the insured parties' insur-

---

1. All references to the electronic case file pertain to documents filed in the Declaratory Judgment Action, unless otherwise indicated. Documents filed in the Nevada Action will be referenced as follows: (Nevada Action, ECF No. ___.)

ance companies regarding which of them should be responsible, in what amount, for covering the equipment destroyed during the Stage Collapse.

Lucky Star, Inc. ("Lucky Star"), the defendant in the Nevada Action, does business as the country music band, Sugarland. SCP, the plaintiff/subrogor in the Nevada Action, is in the business of providing equipment and personnel for live concert productions. Lucky Star engaged SCP for the purpose of providing production design and lighting equipment (hereafter, the "Leased Equipment"), lighting services, video reinforcement, and other related services in connection with Sugarland's "Incredible Machine" tour (the "Tour"). The Tour had two "legs," one running from spring 2010 to October 2010 and the second running from spring 2011 to October 2011. SCP and Lucky Star executed a written Agreement for Services ("2010 Services Agreement") in connection with the 2010 leg of the Tour. (ECF No. 61.) The 2010 Services Agreement, by its terms, is to be governed by Nevada law. It went into effect in March 2010. It did not have an express termination date but, based on the payment schedule incorporated as Exhibit C to the 2010 agreement, apparently was intended only to cover the 2010 leg of the Tour. The Leased Equipment was itemized in Exhibit A to the 2010 Services Agreement.

Some of the Leased Equipment provided by SCP was owned by SCP, but most of the equipment was owned by a third company, Epic Production Technologies ("Epic"), which is not a party to this action, and leased by SCP from Epic for use by Lucky Star during the Tour. SCP and Epic executed a separate written Service Agreement in connection with the 2010 leg of the Tour ("2010 Epic Agreement"). (ECF No. 63.) The 2010 Epic Agreement included provisions requiring SCP to procure insurance to cover Epic's equipment during the lease term and to indemnify Epic for any damage to that equipment.

In turn, one of the specific terms of the 2010 Services Agreement between SCP and Lucky Star placed upon Lucky Star full responsibility for the risk of any damage or loss to the Leased Equipment (regardless of whether it belonged to Epic or SCP) while it was in Lucky Star's "possession." The agreement also required Lucky Star to obtain $3,258,200 in insurance coverage to protect the Leased Equipment and to name SCP as an additional insured and loss payee on the insurance policy. Specifically, this provision of the 2010 Services Agreement states:

> ***Protection of the Equipment.*** Producer agrees to provide security protection and assumes full responsibility for the risk of any loss or damage to the Equipment while the Equipment is in possession of [Lucky Star]. [Lucky Star] shall provide evidence of property insurance coverage in the amount of $3,258,200 for the Equipment at all times the Equipment is in [Lucky Star's] possession. Please name Steven Cohen Productions, LTD, as the additional insured.

(2010 Services Agreement, ECF No. 61, at ¶ 12.)

Although the term "possession" was not defined in the 2010 Services Agreement, Steve Cohen of SCP testified that, in his view, the equipment his company provides for use by an artist on a tour is in the artist's "control" at all times. (Cohen Dep., ECF No. 94, at 100:10–11.) More specifically, he stated:

> [W]hen an artist puts a tour together, they are in control of that equipment from the moment it leaves the depot that the equipment comes from.
>
> Because they are the ones that make the determination on where that equipment goes, when it is used, how often

it's used, and in what venues that it's used in. [sic]

So traditionally in the business, once the equipment leaves the shop ... and gets put into the trucks that are ordered and paid for by the artist, stuff gets put into the trucks, gets delivered to the venue.

And from the moment that it gets into those trucks, it's the artist's responsibility to take care of that gear.

(*Id.* at 100:13–101:2.) Hellen Rollens, an employee of Gellman Management, Sugarland's manager, testified that Lucky Star rented trucks that went to Epic's and the other vendors' warehouses to pick up the equipment for the Tour and transported all the equipment from "point A to point B" and, at the end of the Tour leg, returned the equipment to the vendors. (Rollens Dep., ECF No. 93–5, at 66:11–21.) To her knowledge, SCP did not have trucks out on Tour that kept the equipment. (*Id.* at 67:1–3.) The testimony from Cohen and Rollens, which is undisputed, strongly suggests that Lucky Star was in "possession" or control of the Leased Equipment during the 2010 Tour leg from the time it picked up the equipment in its rented trucks until it returned the equipment at the end of the Tour leg.

In any event, Lucky Star complied with ¶ 12 of the 2010 Agreement by procuring an insurance policy (the "Lucky Star Policy"), by and through its insurance broker, Frost Specialty, issued by Fireman's Fund, on which SCP was named as an additional insured and loss payee on a Commercial Articles Floater of the Inland Marine Coverage, covering the Leased Equipment scheduled in the contract in the amount of $3,258,200. (Lucky Star Policy, ECF No. 60–3, at 92.) Fireman's Fund calculated and charged a premium to Lucky Star for coverage of the Leased Equipment for the duration of the 2010 leg of the Tour, without reference to the un-derlying 2010 Services Agreement and without requiring any information from Lucky Star regarding other insurance that might also cover the Leased Equipment. Fireman's Fund also never requested a copy of the contract between Lucky Star and SCP.

The 2010 leg of the Tour ended in October 2010. By all accounts, the Tour was successful, and Lucky Star and SCP satisfactorily performed under the terms of the 2010 Services Agreement without controversy. It is undisputed that it was Lucky Star's intent to begin the next leg of the Tour in early 2011 with SCP again providing the same lighting equipment, video reinforcement and other related services. According to Hellen Rollens, it was always contemplated that the Tour would continue into 2011 and that, from the production side, "all would stay the same because everybody was pretty happy with the aesthetics and how things were running and the personnel." (Rollens Dep. ECF No. 93–5, at 55:2–6.) Gail Gellman of Gellman Management likewise testified that it was "understood" by all involved that the Tour would continue into 2011. By the time the Tour wrapped up in October 2010, the 2011 dates were already booked, and the band planned to use the same stage set-up and production that it had used in 2010. (Gellman Dep., ECF No. 71, at 10.) Steve Cohen testified that he received a call in late 2010 from Gail Gellman, who told him they were going to "take the same tour out and extend the run in 2011." (Cohen Dep., ECF No. 94, at 51:17–19.) Cohen did not do any new work or redesign before the 2011 leg of the Tour. "I mean, there were no changes. They were taking the exact same show out." (*Id.* at 52:13–14.)

In other words, by the end of 2010, the 2011 dates for the Tour were booked, and it was clear to all involved that there would

be a 2011 leg of the Tour. It was similarly understood that Lucky Star would continue to engage SCP for production design services just as it had in 2010, and that SCP would continue to provide virtually the same Leased Equipment and accompanying services to Lucky Star for the 2011 leg of the Tour.

On February 9, 2011, Steve Cohen sent an email to Hellen Rollens, to which was attached the 2011 Agreement for Services (the "2011 Services Agreement"). The email stated:

Hey Helen,

Attached is a zip folder with the contract for this year and the weekly invoices for the lighting and video production package.

The contract is exactly the same as the previously executed one from last year, and the billing is consistent with how we billed last year.

The only change is that the weekly has increased by 2500.00 per week (over the 24 weeks) to partially compensate for Joe Weir's salary. . . .

I have attached a separate list of just the personnel and their cities of origin. As before (and no rush here) if you could roughly estimate the flights to and from either Nashville or the cities of the start of each run (your choice) that would be helpful so I can more accurately earmark those costs so as to be able to reimburse you in a timely manner. Also, you will be getting an additional invoice for Curtis, Mark and myself for "refreshing and reprogramming" at the start of the tour. I am waiting to finalize the dates so as to bill you correctly as we may all not be required for the full run that Nate indicated in his email. I hope this is clear enough for you, and of course if you need any more information, please call anytime.

Thanks in advance, and here is to another successful tour.

Best;

Steve Cohen

(Rollens Dep. Ex. 16, ECF No. 93–6, at 2.) It is undisputed that neither Steve Cohen on behalf of SCP nor any person on behalf of Lucky Star actually signed the 2011 Services Agreement attached to Cohen's email.

Rollens testified that she recalled receiving this email from Cohen with the attached contract close in time to when the 2011 tour would have started up and that she would have reviewed the contract. (Rollens Dep., ECF No. 93–5, at 55:10–24, 97:24–98:7.) She also indicated, however, that she would have been focused only on the payment schedule and equipment and personnel lists. (*Id.* at 57:3–8.) She could not explain why the 2011 Agreement was not signed but stated: "It's not unusual for any contracts in the music business generally to go—to be unsigned. It's just what we do." (*Id.* at 57:18–10.) Rollens recalled that there were changes in the payment schedule between the 2010 and 2011 agreements, particularly as concerned the payment of Joe Weir, the video director, but she would not have focused on the insurance and indemnification provisions at paragraphs 10, 11, and 12 of the agreements for either year. Rollens testified that her normal practice would have been to forward Cohen's email and the attached contract to Michael Vaden, Lucky Star's business manager, once she had looked over the payment schedule. (*Id.* at 101:11–21.)

The parties stipulated that Gellman Management forwarded a copy of the 2011 Services Agreement to Michael Vaden. While Gellman Management was concerned with the payment provisions, those provisions regarding insurance and indemnity would have been topics for Vaden's office to consider, and Rollens would have expected Vaden to contact her or Gail

Gellman if he had any objection to the language in those provisions. (Rollens Dep., ECF No. 93–5, at 103:3–13.)

In an affidavit submitted in the Nevada Action, Vaden testified that he "received a copy of the 2011 Agreement for Services that [SCP] sent to ... Gellman Management. As Lucky Star's business manager, I reviewed the contract to determine Lucky Star's obligations and to determine what insurance was needed to cover the equipment that SCP provided to Lucky Star for the 2011 Incredible Machine Tour." (Nevada Action, ECF No. 94–4, at ¶ 4.) Vaden testified that he would have contacted Lucky Star's insurance broker to obtain the insurance needed to cover SCP's equipment, in accordance with Lucky Star's obligations under the 2011 Services Agreement.

Gail Gellman did not recall reviewing the 2010 Services Agreement, although she was the person who signed it on behalf of Lucky Star. (Gellman Dep., ECF No. 71, at 8–9.) She testified that her office's usual practice would have been for Hellen Rollens to receive and review such a contract and then bring it to Gellman for her review and signature. (*Id.* at 9.) She agreed with Rollens, with regard to paragraphs 10, 11, and 12 of the 2011 Services Agreement, that Michael Vaden would have been the person responsible, on behalf of Lucky Star, for reviewing the provisions concerning insurance and indemnity, and she would have expected him to have voiced any objection he might have had to the language used in those provisions. (Gellman Dep., ECF No. 71, at 11.) She did not recall his ever making any objections. (*Id.* at 11–12.) Gellman, like Rollens, testified that it was common practice in the music industry not to sign contracts. (*See id.* at 15 ("It's ... more customary to not sign than to sign.").)

Fireman's Fund and Lucky Star maintain that the SCP and Lucky Star never executed the 2011 Services Agreement by signing it and that the agreement therefore does not constitute a binding contract. In support of this position, Fireman's Fund and Lucky Star point to the following provision of the document:

*UPON SCP EXECUTION HEREOF,* THIS AGREEMENT AND THE TERMS AND CONDITIONS CONTAINED HEREIN SHALL BE EFFECTIVE FROM THE DATE FIRST ABOVE STATED AND UPON EITHER (a) THE EXECUTION OF THIS AGREEMENT BY PRODUCER [Lucky Star] OR (b) THE COMMENCEMENT OF PERFORMANCE BY SCP HEREUNDER WITHOUT WRITTEN OBJECTION BY PRODUCER TO THE COMMENCEMENT OF SUCH PERFORMANCE.

(2011 Services Agreement, ECF No. 62, at 4 (emphasis added).)

Nonetheless, it is also undisputed that SCP provided the specified equipment and services required under the 2011 Services Agreement to Lucky Star for the 2011 leg of the Tour and that Lucky Star paid on time each scheduled payment as set forth in Exhibit C—Payment Schedule of the 2011 Services Agreement. In total, Lucky Star made thirty-seven separate timely payments to SCP in accordance with the Schedule of Payments, including ten payments after the Stage Collapse on August 13, 2011.

Contrary to Lucky Star and Fireman's Fund's position, SCP and St. Paul insist that the 2011 Services Agreement is valid and enforceable and that, pursuant to the indemnification provision in that Agreement, Lucky Star is liable to SCP for reimbursement of the cost of the damage to the Leased Equipment that was caused by the Stage Collapse.

The indemnity provision in the 2011 Services Agreement states:

*Protection of the Equipment.* Producer [Lucky Star] agrees to provide security protection and assumes full responsibility for the risk of any loss or damage to the Equipment while the Equipment is "in use." The Equipment and its separate parts shall be deemed "in use" from the time it or its separate parts shall be unloaded or assembled, until such time as the Equipment is reloaded or disassembled for transport. At all times except when the Equipment is "in use," the Equipment will be the responsibility of SCP or any common carrier transporting the Equipment. Equipment must be transported utilizing "air-ride" trailer and trucking technology. [Lucky Star] shall provide evidence of property insurance coverage in the amount of $3,258,200 for the Equipment at all times the Equipment is "in use." Please name Steven Cohen Productions, LTD, as additional insured.

(2011 Services Agreement ¶ 12, ECF No. 62, at 3.) Lucky Star and Fireman's Fund make much of the fact that this provision differs from Paragraph 12 of the 2010 Services Agreement, which required Lucky Star to bear responsibility for the risk of loss or damage to the Leased Equipment while the Equipment was in Lucky Star's "possession." Fireman's Fund points out that Steve Cohen did not reference this change in his email to Hellen Rollens and instead represented that the contract was "exactly the same" as the previous year's contract. Cohen later testified that he was not aware of the changed language either.

At the time of the Stage Collapse, all the Leased Equipment had been unloaded from the transport vehicles and assembled on the concert stage. The sound checks had been completed, and no further preparation of the Leased Equipment was needed in order for Sugarland to take the stage. Although Lucky Star and Fireman's Fund quibble with whether the band was "using" the Leased Equipment at the time of the Stage Collapse, since the band was not actually on stage playing, and further maintain that the 2011 Services Agreement is invalid and unenforceable anyway, it is undisputed that the Leased Equipment was "in use" at the time of the Stage Collapse as that term is defined in the 2011 Services Agreement.

It is also undisputed that the August 13, 2011 Stage Collapse was caused by unusually high winds. There is no evidence that negligence or willful or wanton action or misconduct on the part of Epic, SCP, or Lucky Star caused the Stage Collapse. As a result of the Stage Collapse, much of the Leased Equipment, including equipment owned by SCP as well as equipment owned by Epic and leased by SCP for use during the Tour, was destroyed.

After the Stage Collapse, SCP and its insurer, St. Paul, placed Lucky Star on notice of SCP's claim for property damage under the Lucky Star Policy by letter dated August 17, 2011. Since the Stage Collapse, SCP has continuously asserted and continues to assert that Lucky Star is responsible for paying for the damage to the Leased Equipment. However, in addition to putting Lucky Star on notice of its claim under the Lucky Star Policy and requesting payment from Lucky Star and its insurer, SCP also submitted a property damage claim under its own insurance policy (the "SCP Policy"), issued by St. Paul, in connection with the loss of the equipment owned by SCP and Epic.

Sometime shortly after the Stage Collapse and its receipt of SCP's notice of claim, Fireman's Fund requested from Lucky Star a copy of its contract with SCP. Lucky Star, through its business manager, provided Fireman's Fund with a copy of the unsigned 2011 Services Agreement.

On February 10, 2012, Lucky Star submitted a Sworn Statement in Proof of Loss ("Lucky Star Proof of Loss") to Fireman's Fund as its insurer, requesting coverage for damage to property owned by Lucky Star as well as "property in [Lucky Star's] custody and control." (Proof of Loss, Att. A, ECF No. 66, at 3.) In the Proof of Loss, Lucky Star included the equipment leased from SCP, in an amount up to $3,258,200. (Proof of Loss, Att. A, ECF No. 66, at 4.) For its part, Epic put SCP on notice of its claim under the SCP Policy and also submitted a property damage claim under a separate policy owned by Epic (the "Epic Policy"), also issued by St. Paul, in connection with the loss of equipment owned by Epic and Epic's loss of business income resulting from damage to its equipment.

Fireman's Fund opened an insurance claim for the property damage claim submitted by Lucky Star after the Stage Collapse. St. Paul opened an insurance claim for the property damage claim submitted by SCP after the Stage Collapse. St. Paul opened a separate insurance claim related to the claim submitted by Epic, which was adjusted separately from the claim submitted by SCP.

The SCP Policy was in effect on the date of the Stage Collapse. However, as issued, the SCP Policy did not have sufficient limits under the applicable coverage provisions to cover the equipment leased by SCP from Epic. As issued, the SCP Policy provided coverage in the amount of $3,925,238 for "Scheduled Equipment" but a coverage limit of only $250,000 for both "Unscheduled Owned Equipment" and "Equipment of Others." (See SCP Policy, ECF No. 60–1, at 52.) During its investigation of the property damage claim submitted by SCP after the Stage Collapse, St. Paul determined that an error had been made in issuing the SCP Policy and that the $3,925,238 coverage limit should have been applicable to both Scheduled

Equipment and Equipment of Others. St. Paul, therefore, reformed the SCP Policy after the Stage Collapse to reflect that the coverage limit applicable to Equipment of Others was $3,925,238. The reformation of the SCP Policy was applied retroactively so that it was effective as of the date of the Stage Collapse. St. Paul did not charge SCP any additional premium in connection with the reformation of the policy based on what was apparently an oversight.

The Epic Policy was in effect on the date of the Stage Collapse. The coverage limit for Rental Property Protection—Entertainment under the Epic Policy is $31,000,000.

The Lucky Star Policy was likewise in effect on the date of the Stage Collapse. However, although Lucky Star had added SCP as an additional insured and loss payee on the Lucky Star Policy in 2010, according to Fireman's Fund, SCP was not an additional insured or loss payee at the time of the Stage Collapse, because coverage for the equipment had been dropped for the period between the 2010 and 2011 legs of the Tour and, as a result of an error by Lucky Star, had not been not added back onto the policy when the 2011 Tour began. Thus, as the policy existed on the date of the Stage Collapse, the Lucky Star Policy did not provide coverage for the loss or damage to the equipment owned by SCP or Epic. St. Paul maintains that this constituted a breach of the 2011 Services Agreement. Fireman's Fund maintains that Lucky Star's oversight did not constitute breach of contract because the 2011 Services Agreement was not executed and therefore not enforceable.

Regardless, during its investigation into the property damage claim submitted by Lucky Star after the Stage Collapse, Fireman's Fund determined that the equip-

ment leased from SCP had not been added back onto the Commercial Articles Floater of the Lucky Star Policy before the Stage Collapse, although the equipment had been covered for the preceding year. Fireman's Fund, in accordance with a request made by Lucky Star's insurance broker, reformed the Lucky Star Policy to provide coverage limits in the amount of $3,258,200. Fireman's Fund approved the reformation of the Lucky Star Policy verbally on December 9, 2011 and in writing on December 11, 2011. Fireman's Fund issued a change endorsement evidencing the reformation of the policy to provide this coverage on January 26, 2012. Pursuant to the reformation of the Lucky Star Policy, SCP was retroactively designated a loss payee under the Commercial Articles Floater of Lucky Star's Policy as of the time of the Stage Collapse. Pursuant to the reformation of the Lucky Star Policy, Fireman's Fund charged Lucky Star, and Lucky Star paid, an additional premium of $13,570 for the additional coverage under the Commercial Articles Floater of the Lucky Star Policy, retroactive to the time of the Stage Collapse. After reforming the Lucky Star Policy, Fireman's Fund set in place a reserve of $1,750,000 for the portion of Lucky Star's claim relating to the equipment leased from SCP. Fireman's Fund has never tendered payment for the damage to the equipment leased from SCP.

All three of the insurance policies implicated in this controversy contain "other insurance" provisions. The Lucky Star Policy's "other insurance" provision states:

The coverage provided by this policy shall apply only as excess insurance over any other valid and collectible insurance or coverage that applies to the covered property.

(Lucky Star Policy, ECF No. 60–3, at 98.) The SCP Policy's "other insurance" provision states:

Other insurance may be available to cover your loss. If so, we'll pay only the excess over what you have received from the other insurance.

(SCP Policy, ECF No. 60–1, at 58.) And the Epic Policy contains the following "other insurance" provision:

This agreement is excess insurance unless you have specifically agreed in writing prior to the loss that this insurance will be primary.

(Epic Policy, ECF No. 60–2, at 104.)

After the Stage Collapse, Epic sought payment for its damaged equipment from SCP and SCP's insurer, St. Paul, pursuant to the 2011 Epic Agreement. Epic placed SCP and St. Paul on notice that it was making a claim for its property damage under the SCP Policy. There is no dispute that, as between SCP and Epic, SCP was responsible for the damage to Epic's equipment based on the terms of the 2011 Epic Agreement and the excess-only language of the Epic Policy. Moreover, because Fireman's Fund disputed responsibility for covering the Leased Equipment and because of the continuing and increased risk of exposure to SCP posed by the delay in payment to Epic for its equipment, St. Paul adjusted the claim for property damage submitted by SCP, which covered equipment owned by both Epic and SCP.

St. Paul retained Neil Gibson, Senior General Adjuster with Crawford & Company, to serve as the person in charge of the adjustment of the SCP claim. It is undisputed for purposes of the parties' motions that Gibson has specialized knowledge in the field of property losses in the musical entertainment industry. In adjusting the claim, Gibson reviewed the equipment, pictures, documents, other data, as well as sworn statements and proofs of loss submitted by SCP. He also conducted evaluations of the damaged property.

Gibson ultimately determined that the Stage Collapse had resulted in property damage losses to the equipment in SCP's claim in the amount of $1,961,203.66.

Based on that adjustment, St. Paul paid out $1,961,203.66 under the SCP Policy for damage to the equipment owned by SCP and equipment owned by Epic and leased by SCP for the Tour. Of that sum, $1,833,193.33 went directly to Epic, at the request of SCP, to cover the damage to Epic's equipment. St. Paul paid $128,010.33 to SCP for damage to the SCP-owned equipment.

Fireman's Fund did not request or receive a copy of the 2010 Services Agreement or the 2011 Services Agreement until after the Stage Collapse, and it did not consider the 2010 or 2011 Services Agreement in calculating and charging premiums to Lucky Star. There is no dispute that Lucky Star had an insurable interest in the equipment owned by SCP and leased by SCP from Epic for the Tour. Despite having access to it, Fireman's Fund never conducted any inspection or evaluation of the Leased Equipment damaged during the Stage Collapse and never requested to do so. As Fireman's Fund points out, however, at the time of the Stage Collapse, damage to the Leased Equipment was not technically covered by the Lucky Star Policy, and by the time the policy was reformed to cover the equipment, St. Paul had already adjusted the loss and issued payment to Epic and SCP. Even after reformation of the policy, however, Fireman's Fund never performed any analysis or made any determination of the actual cash value or replacement value of any of the Leased Equipment.

## II. PROCEDURAL BACKGROUND

Fireman's Fund filed the Declaratory Judgment Action in this Court in August 2012, asserting that an actual controversy had arisen and existed between Fireman's Fund and St. Paul

> concerning their respective rights and obligations under the insurance policies issued to [Lucky Star], SCP and Epic. Fireman's Fund alleges that the [Lucky Star] Policy is excess only and, therefore, it has [no] obligation under the policy to pay for any loss or damage to SCP's or Epic's equipment until the applicable limits of the Travelers' and/or St. Paul policies are exhausted. Travelers and/or St. Paul dispute Fireman's Fund's position and maintain[ ] that Fireman's Fund's obligations under the [Lucky Star] Policy are primary and that it must pay for any loss or damage to the equipment, irrespective of the "Other Insurance" provisions in the parties' policies.

(Compl., ECF No. 1, at ¶ 22.) In the original complaint, Fireman's Fund sought relief in the form of

> a judicial determination of the parties' respective rights and obligations under the policies and a declaratory judgment that the [Lucky Star] Policy is excess over the coverage afforded under the Travelers and/or St. Paul policies ... and, that therefore, Fireman's Fund has no obligation to make any payments under the [Lucky Star] Policy for the damaged equipment. . . .

(*Id.* ¶ 23.) In the alternative, Fireman's Fund sought a judicial determination that "coverage under the [Lucky Star] Policy must be equitably pro-rated taking into account the applicable limits and coverage" provided by St. Paul's policy. (*Id.* ¶ 24.)

Fireman's Fund filed an amended complaint in this Court on April 3, 2014, reincorporating the original claim for declaratory relief and alternative claim set forth above, but also including two new claims for declaratory relief. In the first of these, Fireman's Fund seeks

a judicial determination of the parties' respective rights and obligations under the policies and a declaratory judgment as to the amounts that Fireman's Fund is obligated to pay for the property damage under the [Lucky Star] Policy, if any, after taking into account the policies' respective "Other Insurance" clauses, all the terms and conditions of the policies, the reasonableness of Defendants' payments for the property damage, and Defendants' obligations to make the payments under the SCP and/or Epic policies.

(Am. Compl., ECF No. 38, at ¶ 27.) In the second new claim (and third claim for relief), Fireman's Fund seeks a judicial determination and declaration that the reformation of the SCP Policy after the Stage Collapse was "without adequate consideration," making St. Paul's payments to Epic under the SCP Policy voluntary, and therefore that St. Paul is "barred from seeking contribution and/or reimbursement from Fireman's Fund of any of the amounts it paid to Epic under the SCP policy." (*Id.* ¶¶ 29, 30.)

Meanwhile, in November 2012, shortly after Fireman's Fund initiated this action, SCP filed suit against Lucky Star in the United States District Court for the District of Nevada, seeking enforcement of the 2011 Services Agreement and demanding payment to cover the damage to the Leased Equipment in accordance with the indemnification provision in that agreement. Lucky Star answered, denying liability, and on October 3, 2014 filed a motion to dismiss for lack of subject-matter jurisdiction, on the basis that SCP had been completely reimbursed by insurance for the loss of equipment except for its insurance deductible in the amount of $7,500, making the amount in controversy less than the minimum amount required for diversity jurisdiction. SCP responded in opposition to the motion. The Nevada court ultimately granted that motion but

granted the plaintiff's motion to file an amended complaint.

SCP filed its Second Amended Complaint in June 2015, adding as a plaintiff "St. Paul Fire & Marine Insurance Company, a wholly owned subsidiary of The Travelers Companies, Inc., as subrogee of Steven Cohen Productions, Ltd." In this action, St. Paul, as subrogee, seeks to recover from Lucky Star the approximately $1.9 million paid by St. Paul to SCP to cover damages caused by the Stage Collapse, and SCP seeks to recover the "its insurance deductible in the amount of $7,500 and other litigation related expenses." (Nevada Action, ECF No. 79, at ¶ 23.)

In the same order granting Lucky Star's motion to dismiss and directing SCP to file an amended complaint, the Nevada district court *sua sponte* directed the parties to show cause why venue in that case should not be transferred to this district for consolidation with the Declaratory Judgment Action. The parties filed briefs in response to this directive, and the Nevada court entered an order transferring the Nevada Action to this Court. In reaching its conclusion that transfer of venue was warranted, the Nevada court first determined that, because SCP had never signed the underlying 2011 Services Agreement, the agreement was not a binding contract, and, because the contract was not binding, the forum-selection clause in the contract had no effect on the court's transfer analysis. The court concluded based on the other factors relevant under 28 U.S.C. § 1404(a) that transfer was warranted.

The Nevada Action was transferred to this Court effective March 23, 2016 and reassigned to the undersigned on March 31, 2016. The two actions have now been consolidated for all purposes.

Well prior to the transfer order, SCP had filed a motion for summary judgment

against Lucky Star in the Nevada Action in June 2015. (Nevada Action, ECF No. 79.) The motion is fully briefed and remains pending. Meanwhile, both parties in the Declaratory Judgment Action had filed motions for summary judgment in this Court in February 2015. The motions were administratively terminated pending resolution of the motion for summary judgment and the transfer determination in the Nevada Action. The motions have now been reinstated as pending.

## III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure allows a party to move for summary judgment in its favor with respect to entire claims or defenses or to parts of claims or defenses. Fed. R. Civ. P. 56(a). Pursuant to Rule 56, summary judgment must be entered in favor of a movant if the "record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(A), 56(a). To meet this burden, the moving party may rely upon the evidentiary materials identified in Rule 56(c)(1)(A) or may merely rely upon the failure of the opposing party to make a showing sufficient to establish the existence of one or more elements essential to that party's case and upon which that party will carry the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *United States v. Storey*, 640 F.3d 739, 743 (6th Cir.2011).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party to the litigation files a summary

judgment motion. *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009). Each cross-motion must be evaluated on its own merits, with the Court viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir.2006).

## IV. DISCUSSION

### A. The Validity and Enforceability of the 2011 Services Agreement

The Court finds, as an initial matter, that the validity and enforceability of the 2011 Services Agreement is the keystone issue in this consolidated action, governing the insured parties' relationship with each other and, in turn, the insurance companies' obligations under the policies issued to Lucky Star and SCP. For that reason, the Court will address first SCP and St. Paul's motion for summary judgment in the Nevada Action.

The Nevada district court, in the course of deciding whether to transfer venue, concluded as a threshold matter that it was "apparent" from the language of the 2011 Services Agreement that SCP's signature was required for acceptance of the agreement and that, because the agreement was unsigned, it did not constitute a binding contract. (March 23, 2016 Order, Nevada Action, ECF No. 108, at 7.) As a result, that court found that the forum-selection clause in the agreement was likewise not binding. Thus, the first question before this Court is whether it is constrained by the Nevada court's conclusion. As set forth below, the Court finds that it is not so constrained and, further, that the 2011 Services Agreement is valid and enforceable.

#### 1. The Doctrine of the Law of the Case

The law-of-the-case doctrine provides generally that findings made at one

point in a litigation become the law of the case for subsequent stages of that same litigation. *United States v. Moored,* 38 F.3d 1419, 1421 (6th Cir.1994). *See also Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) ("As most commonly defined, the doctrine [of law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (citing 1B Moore's Fed. Practice ("Moore's") ¶ 0.404 (1982)). The doctrine applies with equal force to the decisions of coordinate courts in the same case and to a court's own decisions. *Christianson v. Colt Indus.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).

■ Importantly, however, while the doctrine "directs a court's discretion, it does not limit the tribunal's power." *Arizona,* 460 U.S. at 618, 103 S.Ct. 1382. And the same doctrine recognizes that "it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." *Id.* at 618 n. 8, 103 S.Ct. 1382 (citing *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967)). Moreover, it is widely recognized that, "[a]t the trial level, the doctrine of the law of the case is little more than a management practice to permit logical progression toward judgment. Prejudgment orders remain interlocutory and can be reconsidered at any time." Moore's ¶ 0.404. The Court therefore finds that it is not bound by the Nevada court's interlocutory decision regarding the validity of the 2011 Services Agreement and is convinced, as discussed below, that the ruling was clearly erroneous.

This Court will, however, adopt as the law of the case the Nevada district court's decision to transfer the Nevada Action to this Court for consolidation with the Declaratory Judgment Action, despite the Court's finding herein that the 2011 Services Agreement is valid and enforceable and, therefore, that the forum-selection clause would likewise be valid. *See Christianson,* 486 U.S. at 816, 108 S.Ct. 2166 (noting that, because of the possibility of forcing a transferred case into perpetual litigation by playing "jurisdictional ping-pong," the law-of-the-case doctrine applies "with even greater force to transfer decisions than to decisions of substantive law").

### 2. The Motion for Summary Judgment in the Nevada Action

■ The 2011 Services Agreement, by its terms, provides that it will be governed by Nevada Law. (2011 Services Agreement ¶ 20.) Courts in Tennessee will honor a choice-of-law provision "if the state whose law is chosen bears a reasonable relationship to the transaction and absent a violation of the forum state's public policy." *Wright v. Rains,* 106 S.W.3d 678, 682 (Tenn.Ct.App.2003). Neither party disputes that the agreement is governed by Nevada law. Under Nevada law, contract interpretation is a question of law, *Diaz v. Ferne,* 120 Nev. 70, 84 P.3d 664, 666 (2004), but the question of whether a contract exists is one of fact. *May v. Anderson,* 121 Nev. 668, 672, 119 P.3d 1254 (2005).

In their motion for summary judgment in the Nevada Action, SCP and St. Paul argue that although neither party signed it, the 2011 Services Agreement "became effective, on its own express terms, upon the commencement of performance by SCP without written objection by [Lucky Star]." (Nevada Action, ECF No. 79, at 5.) They also argue that the Leased Equipment was "in use" at the time of the Stage Collapse and therefore that, pursuant to Paragraph 12 of the 2011 Services Agreement, Lucky Star assumed full responsibility for the damages caused by the Stage Collapse.

In the documents filed in the Declaratory Judgment Action in this Court, Fireman's Fund insists that no valid, enforceable contract exists because (1) the contract itself indicates that it will not be effective unless first executed by SCP, but it was never signed by SCP; (2) the agreement was not signed by either party, and under Nevada law a contract must be signed by at least one party to be enforceable; and (3) the 2011 Agreement is a lease under Nevada law and, as such, is governed by Nevada's statute of frauds, which requires the signature of the party against whom enforcement is sought. (ECF No. 92, at 12 (citing Nev. Rev. Stat. Ann. § 104A.2201).) In Lucky Star's response in opposition to the motion for summary judgment in the Nevada Action, Lucky Star raises essentially the same points but also argues that:

(1) SCP and St. Paul fail to provide evidence to establish contract formation or to support a claim for damages;

(2) the 2011 Services Agreement contains an express anti-subrogation clause, which bars recovery in this case;

(3) the "in use" clause of ¶ 12 of the 2011 Services Agreement is "fundamentally different" from the parallel paragraph in the 2010 Agreement and there is "[n]o evidence that anyone knew this change had been made or what it meant" or that anyone, including SCP, had assented to it (Nevada Action, ECF No. 94, at 21);

(4) the Agreement is void because of Steve Cohen's misrepresentation that the 2011 Services Agreement was identical to the 2010 Agreement;

(5) St. Paul fails to introduce evidence to show its right to subrogation of the amounts paid to SCP and Epic; and

(6) the Court lacks jurisdiction over SCP's claim for $7,500.

(Nevada Action, ECF No. 94.)

In their reply brief, SCP and St. Paul clarify that they seek summary judgment on only two issues: whether the 2011 Services Agreement is valid and enforceable, and whether the Leased Equipment was "in use" at the time of the Stage Collapse. They strenuously contest Lucky Star's arguments concerning the validity and construction of the Agreement and the Court's jurisdiction over SCP's claims.

Because they do not seek adjudication at this time of damages, SCP and St. Paul's motion is more properly characterized as a motion for partial summary judgment on the issue of liability only. Accordingly, each of Lucky Star's and Fireman's Fund's material arguments except those concerning the computation of damages is addressed below.

### 1. The Statute of Frauds

■ The parties do not dispute that the 2011 Services Agreement is in fact a lease agreement governed by Nevada's statute of frauds, and the Court likewise finds that the statute pertains to the claims at issue here. By its terms, Nevada's Uniform Commercial Code—Leases "applies to any transaction, regardless of form, that creates a lease." Nev. Rev. Stat. Ann. § 104A.2101. The term "lease" is defined as "a transfer of the right to possession and use of goods for a term in return for consideration." Nev. Rev. Stat. Ann. § 104A.2103. Although styled as an "agreement for services," the agreement at issue here clearly involved the transfer of the right to possess and use goods for a limited period of time in exchange for consideration. The 2011 Services Agreement is therefore governed by the statute of frauds contained in the UCC.

██ For a lease contract involving payments in excess of $1,000 to be enforceable, there generally must be "a writing, signed by the party against whom enforcement is sought or by that party's authorized agent, sufficient to indicate that a lease contract has been made between the parties and to describe the goods leased and the lease term." Nev. Rev. Stat. Ann. § 104A.2201(1)(b). The statute also, however, provides an exception to the writing requirement: "A lease contract that does not satisfy the requirements of subsection 1 [that is, the writing requirement], but which is valid in other respects, is enforceable ... with respect to goods that have been received and accepted by the lessee." Nev. Rev. Stat. Ann. § 104A.2201(4)(c). Because there is no dispute here that Lucky Star received and accepted the goods, the fact that it did not sign the contract does not render the contract unenforceable under the statute of frauds.

## 2. The Absence of Signatures on the Contract

In asserting that the contract is clearly enforceable by its own terms despite the absence of signatures, SCP and St. Paul elide over the precise wording of the contract clause to which they refer. The relevant provision states, as set forth above: "*Upon SCP execution hereof*, this agreement ... shall be effective ... upon ... the commencement of performance by SCP hereunder without written objection by [Lucky Star]." (2011 Services Agreement, ECF No. 62, at 4 (emphasis added).) Because SCP did not technically execute the agreement by having it signed by Steve Cohen, this provision by itself does not render the agreement effective and enforceable. Lucky Star and Fireman's Fund argue that (1) the failure of *either* party to sign the contract renders it unenforceable under Nevada law; and (2) SCP's failure to sign the contract as contemplated by the written terms thereof means that no valid, enforceable contract was formed.

### (a) The Failure of Either Party to Sign the Contract

██ Under Nevada law, "[b]asic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson*, 121 Nev. 668, 119 P.3d 1254, 1257 (2005) (citing *Keddie v. Beneficial Ins., Inc.*, 94 Nev. 418, 580 P.2d 955, 956 (1978) (Baltjer, C.J., concurring)). In other words, an enforceable contract "requires a manifestation of mutual assent in the form of an offer by one party and acceptance thereof by the other ... [and] agreement or meeting of the minds of the parties as to all essential elements." *Keddie*, 580 P.2d at 957 (citations omitted)). Under these principles, the failure of either party to sign a written memorandum of their agreement is essentially immaterial. Once the parties have "agreed upon the essential terms ... an enforceable agreement exists," and one party's failure or even intentional refusal to sign the contract does not render it unenforceable. *May*, 119 P.3d at 1257.

Lucky Star and Fireman's Fund insist that all the applicable case law in Nevada concerning the enforceability of contracts demonstrates that at least one party must have signed the contract to render it enforceable. *See, e.g., U.S. Juice Corp. v. JMF Group, LLC*, No. 2:06CV0288 RLHLRL, 2006 WL 2022992 (D.Nev. July 18, 2006) (denying the defendant's motion to dismiss the breach-of-contract action, stating: "It is immaterial that one party fails to sign a written contract, if the agreement is signed by the other party. The contract binds the non-signing party if (a) he accepts it and (b) both parties act in reliance on it as a valid contract." (citing *J.A. Jones Constr. Co. v. Plumbers & Pipefitters Local 598*, 568 F.2d 1292, 1295

(9th Cir.1978)). However, in these cases and the other precedent cited in the parties' motion papers, at least one of the contractors—typically but not always the person seeking to enforce the contract—had actually signed the agreement. *See also Ward v. Desert Eagle, LLC,* No. 2:06–CV–00938–RCJ–LRL, 2010 WL 455089, at *8 n, 4 (D.Nev. Feb. 2, 2010) (citing *J.A. Jones Construction* for the proposition that a written contract is binding even if one of the parties had not signed before performing under it if both act in reliance on it as a valid contract). None of the cited cases involved a situation in which *neither* party technically executed the contract. In other words, these cases do not necessarily stand for the principle that a written agreement signed by neither party is *not* enforceable, because that was not the issue presented.

Notwithstanding, even when presented with a written contract signed by one party but not the other, the Nevada Supreme Court has suggested that the presence or absence of signatures on the contract is not necessarily dispositive. In *United States Fidelity & Guaranty Co. v. Reno Electrical Works,* 43 Nev. 191, 183 P. 386 (1919), the defendant surety company had executed a bond, but the plaintiff, who sought to enforce it, had not. The defendant attempted to repudiate the agreement by pointing out that the plaintiff had not signed it. The Nevada Supreme Court rejected that argument, stating:

> Parties may adopt a written contract, and thus make it binding as though formally executed by both, without signing it. The copy of the contract is signed by the contractor, and respondent's assent to it is shown by a full performance of its conditions. *If a person accepts and adopts a written contract, even though it is not signed by him, he is deemed to have assented to its terms and conditions and to be bound by them.*

It appears from the allegations of the complaint that the contract alleged therein was acted upon by the parties–by the respondent in finishing the work required by the contract, and by appellant in paying more than two-thirds of the contract price for such work. The contractual relation is evidenced by these mutual acts, and *makes the contract binding on each of the parties, if neither had signed it.*

*Id.* at 387 (emphasis added; internal quotation marks and citations omitted). In one of the cases relied upon by the Nevada court in that case, the Illinois Supreme Court, confronted with a similar scenario, stated:

> The party who accepts and adopts a written contract, though not signed by him, should be deemed to have fully assented to its terms and conditions, and is therefore bound by them.... And where the contract has been accepted and adopted by the party not signing it, he does assent and agree to it on his part, and the law implies a promise to perform. The delivery of a writing, and its acceptance and adoption by the party to whom it is delivered, are necessarily facts *dehors* the writing itself, and must therefore be proved by extrinsic evidence; and, where mutuality is established by proof of the acceptance of the writing, the contract is, notwithstanding such resort to parol evidence, a contract all of which is in writing.

*Memory v. Niepert,* 131 Ill. 623, 23 N.E. 431, 433 (1890) (internal citations omitted).

These cases and others suggest that the Nevada Supreme Court, if confronted with the precise issue, would conclude that the relevant question is not whether either party signed the written agreement but whether they otherwise manifested their intent to be bound by it. And the undisputed evidence in this case, as discussed

below, overwhelmingly supports the conclusion that the parties intended to be bound by the writing, despite their failure to sign it.

*(b) SCP's Failure to Sign the Contract*

Lucky Star and Fireman's Fund argue—and the Nevada district court found—that SCP's failure to sign the contract rendered it unenforceable. The court specifically found that "[n]umerous courts have held that if a written agreement indicates that a signature is required for acceptance, its terms are not binding unless the offeree actually provides a signature." (Nevada Action, ECF No. 108, at 5.) The court found that the written terms of the agreement indicated that SCP's signature was required and that, because SCP had not signed the contract, it was not binding.

The authority upon which the Nevada district court relied concerns, for the most part, the issue of contract formation where the written agreement at issue had not been signed by one or both parties and one of the parties sought to repudiate it early in the parties' relationship. The cited cases do not involve situations where the evidence established that both parties considered themselves bound by the unsigned written contract from its inception and had both fully performed their contractual obligations. For instance, the Nevada district court cited *Jim L. Shetakis Distributing Co. v. Centel Communications Co.,* 104 Nev. 258, 756 P.2d 1186 (1988), as holding that a party may accept an offer by "any reasonable manner" unless specific language or conduct indicates that a particular manner of acceptance is required. *Id.* at 1188. The Nevada Supreme Court indeed held in that case that "the circumstances indicate that a particular manner of contract formation was contemplated by the parties" and that the contract itself unambiguously stated that it would not be binding upon any party until executed by

that party. *Id.* at 1189. As a result, the plaintiff "reasonably assumed that it would not be bound" unless it actually signed the agreement in question. *Id.* at 1189. Moreover, the court noted, "[i]n light of the absence of such compliance [with the method of contract formation contemplated by both parties], the evidence in this case that both parties intended to be presently bound is neither 'convincing' nor is it 'subject to no other reasonable interpretation.'" *Id.* (quoting *Dolge v. Masek,* 70 Nev. 314, 268 P.2d 919, 921 (1954)). In other words, there was essentially no countervailing evidence to support the conclusion in that case that a contract had been formed despite the absence of the plaintiff's signature.

*Dolge* likewise concerned contract formation. In that case, the Nevada Supreme Court cited and relied on a statement by the Maine Supreme Court:

> If the written draft is viewed by the parties merely as a convenient memorial, or record of their previous contract, its absence does not affect the binding force of the contract. If, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed. In determining which view is entertained in any particular case, several circumstances may be helpful, as whether the contract is of that class which are usually found to be in writing, whether it is of such nature as to need a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations.

*Dolge,* 268 P.2d at 921 (quoting *Ms. & Dominion Steamship Co. v. Swift,* 86 Me. 248, 29 A. 1063, 1067 (1894)). The Dolge

court further observed "that some measure of agreement is usually manifested as a basis for preparation of a written draft of agreement," and held that, "[i]f upon rejection of such draft, such manifestation of agreement is to be held to constitute binding contractual assent, the evidence that the parties had intended presently to be bound should, in our view, be convincing and subject to no other reasonable interpretation." *Id.* at 921. The evidence that the parties intended to be bound by the unsigned contract in that case was not convincing, particularly in light of the terms of the written agreement itself, the absence of significant partial performance of the contract, and the fact that the written contract also incorporated the respondents' relinquishment of interest in real property which, under Nevada law, was required to be in writing.[2]

▆ In the case at bar, the parties' intent is not manifested solely by the terms of the written contract itself. Rather, the unequivocal and undisputed evidence establishes beyond any doubt that both parties believed they had entered into a binding contract and, perhaps most importantly, both parties fully performed all

their material obligations under the contract.

From the outset, it is notable that Steve Cohen himself "delivered" the written contract to Lucky Star's management team, attached to an email that itself unambiguously confirmed his acceptance of the terms of the contract. In the email to Hellen Rollens, he stated:

Attached is a zip folder with the contract for this year and the weekly invoices for the lighting and video production package.

The contract is exactly the same as the previously executed one from last year, and the billing is consistent with how we billed last year.

The only change is that the weekly has increased by 2500.00 per week (over the 24 weeks) to partially compensate for Joe Weir's salary. . . .

(Rollens Dep. Ex. 16, ECF No. 93–6, at 2.) It was signed: "Best; Steve Cohen." The email with Steve Cohen's electronic signature constitutes, at the very least, a writing manifesting his adoption of the contract. Following this email, the only communications between Lucky Star and

---

2. Other cases cited by the Nevada district court included a previous opinion by the same court, *Ergon Asphalt & Emulsions, Inc. v. Capriati Const. Corp.*, No. 2:13–cv–1683–GMN–NJK, 2015 WL 1959851 (D.Nev. Apr. 29, 2015), and opinions from Nevada, New Jersey, Connecticut and Oregon, none of which are factually on point, but all of which suggest that a signature, while preferable, is not the only way through which parties manifest their intent to be bound by a contract. *See Leodori v. CIGNA Corp.*, 175 N.J. 293, 814 A.2d 1098, 1106 (2003) ("Without plaintiff's signature on the Agreement that accompanied the 'You and CIGNA' handbook, we cannot enforce the arbitration provision *unless we find some other explicit* indication that the employee intended to abide by that provision. No such indication appears in the record." (emphasis added)); *Open Sols. Inc. v. Granite Credit Union*, No. 3:12–cv–1353–RNC, 2013 WL 5435105, at *2 (D.Conn. Sept. 29, 2013) (where it was undisputed that both parties to a contract had signed it, granting a motion to transfer venue, and noting that "[t]he question of whether a written contract must be signed to be binding is a question of the parties' intent" (quoting 17 C.J.S. Contracts § 85)); *Pac. Photocopy, Inc. v. Canon U.S.A., Inc.*, 57 Or.App. 752, 646 P.2d 647, 650 (1982) ("When the evidence establishes that both parties contemplated a formal written contract together with written approval by the home office of the principal, approval in those terms cannot be dispensed with, at least under the facts at bar."); *Sky Las Vegas Realty, Inc. v. 333–CA, LLC*, No. 54759, 2012 WL 3079118, (Nev. July 27, 2012) (finding acceptance occurred in the absence of a signature where offeree "was not required to sign . . . pursuant to the plain language of the offer").

SCP concerning the terms of the contract were for the purpose of ironing out some misunderstanding about the payments to cover Joe Weir's salary. Those exchanges do not manifest continuing negotiations or an actual dispute regarding changes to the contract terms, however. Instead, they indicate confusion on the part of Lucky Star as to what its obligations were. Once it understood, it apparently complied without objection, accepting delivery of the Leased Equipment and SCP's services in connection therewith and submitting all payments when due.

Further, the parties stipulated that Rollens forwarded the contract to Michael Vaden, Lucky Star's business manager, and Vaden never raised any objection to the contract terms. According to his own testimony, when Vaden received the 2011 Services Agreement, he simply ensured that Lucky Star had insurance coverage in accordance with its obligations under the agreement. And no one, at any time, raised any objection about or appeared even to notice that no one had signed the 2011 contract.

 Finally, principles of equitable estoppel militate in favor of finding an enforceable contract in this case. "In order for the doctrines of estoppel or part performance to apply, Nevada law requires proof by 'some extraordinary measure or quantum of evidence.'" *26 Beverly Glen, LLC v. Wykoff Newberg Corp.*, 334 Fed.Appx. 62, 64 (9th Cir.2009) (quoting *Zunino v. Paramore*, 83 Nev. 506, 435 P.2d 196, 197 (1967)). The doctrines apply in cases involving an allegedly binding written agreement. *Id.* at 64 n. 1. "To constitute estoppel, 'the party relying on it must be influenced by the acts or silence of the other and it must appear that the acts or conduct of the party estopped caused the party relying to act as he would not have acted....'" *Lubritz v. Circus Circus Hotels, Inc.*, 101 Nev. 109, 693 P.2d

1261, 1263 (1985) (quoting *Zunino*, 435 P.2d at 197). Here, there is simply no dispute that both parties fully performed their obligations under the contract: SCP provided all the equipment and services called for by the parties' agreement, and Lucky Star made all the payments required by the new payment schedule, in the increased amounts set forth therein. An apparently herculean effort was made on the part of all parties to continue performing even in the wake of the tragedy presented by the Stage Collapse. Lucky Star never pointed out to SCP that the contract was not signed, and Lucky Star's own intent to be bound by the 2011 Services Agreement was further manifested by the fact that, when it realized *after the Stage Collapse*, that it had *not* complied with its obligation to reinstate SCP as a loss payee and additional insured on its insurance policy, covering the Leased Equipment in the precise amount required by the 2011 Services Agreement, Lucky Star's agent successfully persuaded Fireman's Fund to reform the contract retroactively to reinstate SCP as a loss payee. More specifically, George Frost with Frost Specialty, Lucky Star's insurance broker, testified that at some point after the Stage Collapse he flew to California to meet with representatives from Fireman's Fund, explained the problem, and Fireman's Fund "agreed, even after the claim had happened, to add the equipment because it should have been on the policy and so the policy was reformed at my request and ... we went forward from there." (Frost Dep., ECF No. 93–9, at 67:14–22.)

In sum, the evidence in this case that both parties fully intended to be presently bound is utterly convincing and not subject to any other reasonable interpretation, to paraphrase the Nevada Supreme Court's statement in *Dolge v. Masek*. Taking all the circumstances into account and not merely the absence of signatures, the

Court first finds that the parties intended to and did enter into a written contract, and that the 2011 Services Agreement is binding and enforceable.

### 3. The "In Use" Clause in ¶ 12

 Lucky Star and Fireman's Fund also attack the enforceability of the 2011 Services Agreement by pointing out that Steve Cohen's representation that the 2011 rendition of the contract was "exactly the same" as the 2010 contract was untrue and masked the fact that the indemnity provision had changed. Lucky Star and Fireman's Fund insist that the change materially increased Lucky Star's obligations under the contract and that Lucky Star never agreed to this change. The Court finds that the change at issue was not material and, to the extent that it was, actually inured to Lucky Star's benefit. In any event, contract language, where clear on its face, will be enforced as written. *Ellison v. Cal. State Auto. Ass'n,* 106 Nev. 601, 797 P.2d 975, 977 (1990).

The 2010 Services Agreement included an indemnification provision. Consequently, it could have come as no surprise to anyone that the 2011 Services Agreement also included such a provision. Moreover, the change to the indemnification provision in the 2011 agreement did not actually expand Lucky Star's obligations; instead it narrowed and clarified Lucky Star's obligations. More to the point, the change had no effect on the question of whether Lucky Star had responsibility for the risk of damages to the Leased Equipment at the time of the Stage Collapse. Under either the indemnity provision in either contract, Lucky Star assumed the risk of loss in the circumstance that actually arose.

The original indemnification provision in the 2010 Services Agreement placed upon Lucky Star "full responsibility for the risk of any loss or damage to the Equipment while the Equipment is in [Lucky Star's] possession." (2010 Services Agreement ¶ 12, ECF No. 61 (emphasis added).) The agreement did not define the term "possession," but the scope of Lucky Star's responsibility was indisputably very broad. Steve Cohen testified that, typically, the artist was considered to be "in control" of the equipment used on a tour from the time the artist's trucks picked up the equipment from wherever it was stored up until the equipment was returned at the end of the tour. Certainly SCP was not in possession of the equipment during that time. Lucky Star's witness, Hellen Rollins, confirmed that Lucky Star had the obligation to hire a transport company and to convey the Leased Equipment from one concert venue to the next and then to return the equipment to the various vendors at the end of the tour. The fact that Lucky Star incurred this obligation again strongly suggests that, for purposes of the 2010 Tour, the Leased Equipment was in Lucky Star's "possession" from the time Lucky Star picked up the equipment from Epic's and the other vendors' warehouses until it deposited the equipment back at the warehouses at the close of the Tour leg.

The indemnification provision in the 2011 Services Agreement expressly limited Lucky Star's responsibility for the equipment to the time it was actually "in use," and it defined the term "in use":

> Producer [Lucky Star] . . . assumes full responsibility for the risk of any loss or damage to the Equipment while the Equipment is "in use." The Equipment and its separate parts shall be deemed "in use" from the time it or its separate parts shall be unloaded or assembled, until such time as the Equipment is reloaded or disassembled for transport. At all times except when the Equipment is "in use" the Equipment will be the responsibility of SCP or any common carrier transporting the Equipment.

(2011 Services Agreement ¶ 12, ECF No. 62.) In other words, Lucky Star's responsibility under the 2011 Agreement was narrowed, not expanded.

It is undisputed that the Leased Equipment was "in use," as the Agreement defined that term, at the time of the Stage Collapse. It was unloaded and assembled. No further assembly of the Leased Equipment was required prior to the band's taking the stage. Having no basis for contesting that point, Lucky Star and Fireman's Fund attempt to argue, instead, that the distinction between "possession" and "in use" was a material change that expanded Lucky Star's obligations and to which Lucky Star did not agree, and that Lucky Star was not "physically in possession of the equipment at the time of the stage collapse." (Nevada Action, ECF No. 94, at 22.) This argument borders on the frivolous. First, as suggested above, it appears that Lucky Star was in "possession" of the Leased Equipment for the entire duration of the Tour. There is no other possible party in whose possession it could have been at the time of the Stage Collapse, particularly given that the equipment had been unloaded from the trucks and fully assembled, and the band would already have been on stage but for the weather delay. In short, the Leased Equipment was manifestly both "in use" and in Lucky Star's "possession" at the time of the Stage Collapse. Consequently, the change in the provision was not material to this case. It also did not render the agreement void by reason of fraud or misrepresentation.

#### 4. Jurisdiction Over SCP's Claim

The Court has diversity jurisdiction of the Nevada Action under 28 U.S.C. § 1367(a). In the second amended complaint in that action, SCP asserts that it suffered damages "including but not limited to its insurance deductible in the amount of $7,500 and other litigation relat-ed expenses." (Nevada Action, ECF No. 79, at ¶ 23.) St. Paul seeks to recover monetary damages in excess of $1.9 million. (Id. at ¶¶ 20–22.)

Lucky Star insists that the Court lacks jurisdiction over SCP's claim, because SCP has conceded that its losses resulting from the Stage Collapse are limited to $7,500. Lucky Star cites Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), in support of the proposition that claims cannot be aggregated to provide the necessary jurisdictional amount in controversy.

 Snyder, however, involved a class action in which no single plaintiff met the jurisdictional amount-in-controversy; the case has to some extent been abrogated by amendments to 28 U.S.C. § 1367 and, in any event, is irrelevant here. The Supreme Court has held unequivocally that § 1367(a) permits the exercise of diversity jurisdiction over additional plaintiffs who fail to satisfy the minimum amount-in-controversy requirement, as long as other elements of diversity jurisdiction are present and at least one named plaintiff satisfies the amount-in-controversy requirement. Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 558–59, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005). See id. at 559, 125 S.Ct. 2611 ("[Section] 1367(a) confers supplemental jurisdiction over all claims, including those that do not independently satisfy the amount-in-controversy requirement, if the claims are part of the same Article III case or controversy."). St. Paul, which is now also a plaintiff in the Nevada Action, asserts a claim for damages well in excess of the minimum jurisdictional amount. Lucky Star's contention that the Court lacks jurisdiction over SCP's supplemental claim is therefore patently meritless.

### 5 The Subrogation Issue

Lucky Star argues that, if the 2011 Services Agreement is enforceable, it bars the subrogation claims in this action. In support of this argument, Lucky Star points to the following language in the agreement:

Neither SCP nor Producer shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring such party for the death of or injury to any person or for any loss or damage to any tangible property, or any resulting loss of income, or losses under worker's compensation laws and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees, if and to the extent that any such loss or damage is covered by insurance benefitting such party or was required to be covered by insurance benefitting such party pursuant to this Paragraph 11.

(2011 Services Agreement ¶ 11.) Lucky Star insists that the language in this provision constitutes an unambiguous waiver of any claim that is covered by insurance, that the loss to SCP was covered by the St. Paul insurance policy, and that St. Paul's subrogation claim is barred by the express language in the contract. Lucky Star further argues that, if the language quoted above is deemed to be ambiguous, the Court must still deny SCP and St. Paul's motion for summary judgment, because the provision would have to be construed against SCP and St. Paul. In response, SCP and St. Paul argue that the language quoted above is taken out of context and that the provision must be considered in the context of the entirety of Paragraph 11, which addresses the parties' obligations to procure liability insurance, and in the context of the 2011 Services Agreement as a whole.

The Court rejects Lucky Star's proposed interpretation of what it calls the "anti-subrogation" and "anti-suit" provision and finds no ambiguity in the contract. The single subsection of Paragraph 11 upon which Lucky Star relies, quoted above, must be read in the context of the entire paragraph of which it is a part, and that paragraph must be construed in the context of the agreement as a whole. As discussed at length above, Paragraph 12 apportions responsibility to Lucky Star "for the risk of any loss or damage to the Equipment while the Equipment is 'in use.'" (2011 Services Agreement ¶ 12.) Paragraph 12 specifically required Lucky Star to "provide evidence of property insurance coverage in the amount of $3,258,200 for the Equipment at all times the Equipment is 'in use,'" naming SCP as an additional insured. Paragraph 12 is unambiguously directed at the property damage that is at the heart of the controversy here. Paragraph 11, on the other hand, relates to the "Commercial General Liability" ("CGL") insurance policies each party agreed to purchase for the 2011 Tour to protect against claims by third parties, whether personal-injury claims, wrongful-death claims, or property-damage claims. This provision required each party to procure a CGL policy with "minimum limits for bodily injury and property damage of $1,000,000 each occurrence and $2,000,000 in the aggregate." (Id. ¶ 11.)

Lucky Star's proposed interpretation of Paragraph 11 borders upon the specious. It entirely ignores both the remainder of Paragraph 11 and the entirety of Paragraph 12, and would essentially render meaningless Paragraph 12. The agreement does not bar St. Paul's subrogation claim.

### 6. Conclusion

SCP and St. Paul's motion for summary judgment is actually a motion for partial summary judgment, as it does not request

an adjudication of damages. It simply seeks judgment in its favor on two issues: (1) whether the 2011 Services Agreement is valid and enforceable, and (2) whether the Leased Equipment was "in use" at the time of the Stage Collapse. The Court answers both these questions in the affirmative. The Court entirely rejects Lucky Star's assertions that the Court lacks jurisdiction over SCP's claim for damages and that Paragraph 11 bars the suit altogether and concludes, consequently, that Lucky Star is responsible under the 2011 Services Agreement for the damages to the Leased Equipment caused by the Stage Collapse.

**B. St. Paul's and Fireman's Fund's Obligations Under the Insurance Policies**

### 1. The Motions for Summary Judgment in the Declaratory Judgment Action

St. Paul filed its motion for summary judgment on February 11, 2015, seeking judgment in its favor as a matter of law on the basis that Fireman's Fund has the primary obligation to pay for the property damage at issue and that the underlying contract between SCP and Lucky Star defines the obligations and duties of those parties and the priority of insurance coverage provided by their respective insurers. It seeks judgment in its favor as to all claims asserted by Fireman's Fund and awarding damages in the amount of $1,961,203.66 "plus any additional relief to which it might be entitled." (ECF No. 67, at 2.) The Court observes that St. Paul's request for money damages in its motion is in a procedurally awkward posture in light of the fact that St. Paul has not filed a counterclaim in the Declaratory Judgment Action. Moreover, while St. Paul and SCP demand damages in the Nevada Action, they do not seek damages in their motion for summary judgment in that case.

Fireman's Fund, Lucky Star's insurer, argues in response to St. Paul's motion that the insurers' obligations are governed by the insurance policies themselves, not the unsigned 2011 Services Agreement, in particular because, it maintains, that agreement is unenforceable as a matter of law. Fireman's Fund asserts that, because Lucky Star has no contractual obligation to SCP for the damages caused by the Stage Collapse, Fireman's Fund's insurance coverage for a loss to Lucky Star is not implicated. The Court has already disposed of this argument, above. Fireman's Fund also argues, however, that a factual dispute exists as to whether the payments St. Paul made were actually owed under the 2011 Services Agreement.

Fireman's Fund filed its own motion for summary judgment, also on February 11, 2015, seeking a judicial declaration that the insurance policy it issued to Lucky Star provides excess-only coverage for the property damage claims submitted by SCP (and Epic) to St. Paul after the Stage Collapse and, therefore, that Fireman's Fund has no obligation under the Lucky Star Policy to share in the payments made by St. Paul under the SCP Policy. In the alternative, if the Court finds that the Lucky Star Policy does not provide excess-only coverage, Fireman's Fund requests that the Court issue a declaratory judgment declaring that Fireman's Fund's obligation to share in the payments St. Paul made to Epic and SCP is limited to a *pro rata* share, after considering the applicable limits of the SCP Policy, the Epic Policy, and the Lucky Star Policy.[3]

---

**3.** As indicated above, Fireman's Fund included a claim in its amended complaint for a declaration that SCP's "payments under the SCP policy for damaged property owned by Epic were voluntary and, therefore, that [SCP] is barred from seeking contribution and/or reimbursement from Fireman's Fund of any of the amounts it paid to Epic under

## 2. The Policies Are Governed by the Insured Parties' Obligations to Each Other

As set forth in the fact section, above, each of the insurance policies at issue—the Lucky Star Policy, the SCP Policy, and the Epic Policy–contains its own "Other Insurance" provision. Fireman's Fund maintains that Tennessee law governs the interpretation of the Lucky Star Policy and that, under the Four Corners rule applied by Tennessee courts, Fireman's Fund is responsible only for excess coverage, that is, coverage that kicks in only after all other avenues of recovery are exhausted.[4] Fireman's Fund argues that the scope of the policy and its obligations thereunder "are determined by reference to the policy terms—not to any unincorporated extrinsic agreements to which the insurer is not a party." (ECF No. 83, at 8.) It further argues that, because the Lucky Star Policy expressly stated that it was excess over

other insurance, the Court "should not require Fireman's Fund to contribute to the loss at all." (*Id.*)

▉▉▉ This Court, as a federal court sitting in diversity, is obliged to apply the jurisprudence of the supreme court of the applicable state on issues of that state's law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Rutherford v. Columbia Gas*, 575 F.3d 616, 623 (6th Cir.2009). There appears to be no dispute that Tennessee state law governs the interpretation of the Lucky Star Policy. However, neither Fireman's Fund nor the other parties have pointed to, and the Court is not aware of, any ruling by the Tennessee Supreme Court, or indeed any Tennessee court, addressing the precise issue presented here: the interpretation of competing "other insurance" clauses in the context of a lease agreement clearly making one party responsible to the other for damage or loss to the equipment covered by the competing policies.[5]

the SCP policy." (ECF No. 38, at ¶ 30.) Fireman's Fund appears to have abandoned this claim, which was based on a theory that St. Paul retroactively reformed the SCP Policy without consideration. (*See* Joint Stipulation, ECF No. 60, at ¶¶ 29–31.) In any event, the evidence in the case is that the reformation was based on a mutual mistake, which does not require additional consideration. *See, e.g., In re Martinez*, 393 B.R. 27, 32 (D.Nev. 2008) ("One need not be a student of the law of mistake to know that any contract formed under such circumstances can be reformed by either party, or if not reformed, avoided." (citing *Realty Holdings, Inc. v. Nevada Equities, Inc.*, 97 Nev. 418, 633 P.2d 1222, 1223 (1981); Restatement (2d) of Contracts § 155 cmt. b (1981)).

4. Fireman's Fund maintains that SCP's policy should be governed by New York law but has not shown that New York law would differ materially from that of Tennessee.

5. The cases cited by Fireman's Fund are not on point or do not support Fireman's Fund's position. *Kiser v. Wolfe*, 353 S.W.3d 741 (Tenn.2011), for instance, simply stands for the proposition that, "[w]hen construing an

insurance contract, "the paramount rule ... is to ascertain the intent of the parties ... [which] is to be derived from the four corners of the policy giving effect to all parts." *Id.* at 748 (citations omitted, ellipses in original). The case does not address what happens when the parties' intent cannot be fully derived from the four corners of the insurance policy.

In *Continental Insurance Co. v. Excel Insurance Co.*, 541 S.W.2d 952 (Tenn.1976), which Fireman's Fund also cites, a truck under a trip lease was involved in an accident with a third party which resulted in third-party injuries and claims The insurer for the lessee brought an action against the insurer for the lessor, seeking proration of alleged overlapping insurance coverage. The trial court allowed proration, but the Tennessee Supreme Court reversed, holding that the policy of the lessee's insurer afforded primary coverage while that of the lessor provided excess coverage and that proration did not apply. Although Fireman's Fund characterizes this case as allocating loss based on the language of dueling insurance policies without regard to the underlying lease agreements, in reality, the lease requirements and the insurance pol-

Where the state supreme court has not spoken directly or indirectly on a particular issue, this Court is called upon to predict how that court would rule if presented with the issue by looking at "all available data." *Rutherford,* 575 F.3d at 620 (citations omitted). In so predicting, the federal court may consider the teachings of treatises as well as the practices of other states. *See Ventas, Inc. v. HCP, Inc.,* 647 F.3d 291, 307 (6th Cir.2011) (noting that "all relevant data" may include "state appeals court rulings, restatements of the law, academic publications, and the majority rule" (quoting *Bailey v. V & O Press Co.,* 770 F.2d 601, 604 (6th Cir. 1985)).

A prominent treatise, *Couch on Insurance,* in its discussion of the rules that apply where liability policies contain competing "other insurance" clauses, has recognized that such clauses "may be circumvented by effect of a contract or a rule of law. For example, ... an indemnity agreement between the insureds or a contract with an indemnification clause ... may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy." 15 Couch on Ins. § 219:1 (3d Ed. updated Nov. 2014).

And a majority of cases from all over the country appear to that follow this rule. For example, *Wal–Mart Stores, Inc. v. RLI Insurance Co.,* 292 F.3d 583 (8th Cir. 2002), upon which St. Paul relies, involved a dispute among several insurers as to which of them had the responsibility to cover the personal injuries at issue in that case. The litigation arose out of a sales agreement between Wal–Mart and Cheyenne, a lamp distributor. One of the lamps distributed by Cheyenne and purchased at Wal–Mart was defective and caused a fire that severely harmed a child, whose family sued Wal–Mart, Cheyenne and other parties in California state court for personal injuries. The defendants settled with the family, but the settlement left unresolved the question of who among the

icies were entirely consistent. Because the coverage provided by the policies was consistent with the terms of the insured parties' lease agreement, the court was not called upon to determine whether the lease would have trumped the terms of the insurance policies.

Fireman's Fund describes *Shelter Mutual Insurance Co. v. State Farm Fire and Casualty Co.,* 930 S.W.2d 570 (Tenn.Ct.App.1996), as offering a "thorough explanation of how Tennessee law addresses the impact of an Other Insurance clause on an insurer's obligations" (ECF No. 83, at 8). The case involved a situation in which one applicable insurance policy contained a *pro rata* "other insurance" clause and the other contained an "excess only" clause. The court found that the clauses were not repugnant, that the policy that contained the *pro rata* clause clearly was intended to provide primary insurance coverage while the policy that contained the excess-only clause was clearly intended to be provide excess coverage only. This case did not involve an underlying contractual arrangement between the covered parties, however.

*Charter Oak Fire Ins. Co. v. Lexington Ins. Co.,* No. M2002–01752–COA–R3–CV, 2004 WL 431488 (Tenn.Ct.App. Mar. 2, 2004), involved insurance claims arising from fire damage to premises leased by a Chili's Restaurant. The interpretation of the insurance policies' "other insurance" provisions became relevant only because damages sought by the property owner for loss of rental income were not allocated to Chili's in the lease agreement, though the insurance policy procured by Chili's was apparently broad enough to cover that loss. Notably, there was no indication in the opinion that Chili's was in breach of the lease agreement based on its insurer's refusal to cover the property owner's loss of rental income. Rather, Chili's appeared to have complied with its obligations under the lease by insuring coverage of and payment for the physical damage to the leased premises. The parties assumed, and there was no litigation concerning, Chili's insurance policy's primary coverage for the physical damage to the leased premises. This case does not actually help Fireman's Fund's position, and instead weighs in favor of St. Paul's.

defendants was responsible for what portion of the settlement. Wal–Mart and its insurer, National Union, brought a declaratory judgment action in federal court, arguing that they were protected by an indemnity clause in the vendor agreement between Wal–Mart and Cheyenne.

The district court ruled against Wal–Mart and National Union, holding, based solely on the language in the various insurance policies, that Wal–Mart's insurance policy, issued by National Union, was primary and that Cheyenne's insurance policy, issued by RLI, was excess only. On appeal, the Eighth Circuit noted that two assumptions underlay that conclusion: "[F]irst, that the language of the insurance policies governed the allocation of liability for the settlement, not the indemnity agreement between Cheyenne and Wal–Mart; and second, that Wal–Mart's insurance with National Union was underlying insurance under RLI's policy and must be exhausted before RLI is obligated as an excess insurer." *Id.* at 585. The appellate court disagreed with these assumptions under the circumstances presented by that case and therefore reversed, holding that insurance policies' "other insurance" provisions were irrelevant when the insured parties' contractual arrangement specifically allocated responsibility among them.

In reaching that conclusion, the court expressly rejected RLI's argument that the indemnification provision was irrelevant and that "only the language of insurance policies determine[s] the priority of payment between insurers." *Id.* at 587. It held instead that courts must "assess whether the factual circumstances create[ ] a relationship between the indemnity contract and the insurance allocation issues." *Id.* (internal quotation marks and citations omitted). Two factors that were important to its decision in this case were (1) that the contract between Wal–Mart and Cheyenne required the insurance arrange-

ments, supplying a "close factual relationship between the indemnity obligation and the insurance contracts," *id.* at 589–90; and (2) there was no evidence that the RLI premium was based on an assumption that Wal–Mart was also covered by National Union. The Eighth Circuit acknowledged that courts had not uniformly held that indemnity agreements should govern insurance-allocation disputes, but noted that "there are many more cases ruling that indemnity agreements determine the allocation of liability in an insurance dispute." *Id.* at 588 (citing 15 Couch on Ins. § 219:1 93d ed.1999).

In addition to citing *Couch on Insurance*, the Eighth Circuit cited and relied on *Chubb Insurance Company of Canada v. Mid–Continent Casualty Co.*, 982 F.Supp. 435 (S.D.Miss.1997), a district court case involving a dispute between two insurers with identical and dueling "other insurance" clauses, in which the indemnity agreement between the insured parties was held to be paramount. In that case, the defendant-indemnitor was performing "workover operations" on an oil well operated by the plaintiff-indemnitee pursuant to a contract between them. The defendant's rig overturned and injured two of its employees. The employees sued the indemnitee in state court. The indemnitee's insurer, Chubb, brought a declaratory judgment action in state court to resolve the question of which insurance company was responsible for defending against or ultimately paying the claims. Despite the defendant's argument that both parties should share liability equally based on the identical "other insurance" clauses in their policies, which essentially made them both "primary" insurers, the district court disagreed. As that court explained:

> [T]o the extent that Smith Brothers [the indemnitor] is liable to Coho [the indemnitee] for indemnity [under the contract

between them], so, too, are its insurers, to the extent that their policies provide coverage for Smith Brothers' indemnity liability. To hold otherwise would render the indemnity contract between the insureds completely ineffectual and would obviously not be a correct result, *for it is the parties' rights and liabilities to each other which determine the insurance coverage*; the insurance coverage does not define the parties' rights and liabilities one to the another.

*Id.* at 438 (citations omitted; emphasis added).

Cases from other jurisdictions are generally consistent in adopting this approach, without regard to which state's law applies. *Cf. Chandler v. Liberty Mut. Ins. Grp.*, No.2005–71(WOB), 2005 WL 5629027, 2005 U.S. Dist. LEXIS 44426 (E.D.Ky. Nov. 3, 2005) (rejecting the plaintiff's argument that the underlying lease between the insured parties was irrelevant extrinsic evidence, noting that "the majority of courts appear to have held that such an indemnity agreement is not only relevant, but pivotal to the 'excess v. primary' coverage analysis"), *aff'd*, 212 Fed.Appx. 553, 557 (6th Cir.2007) (affirming the district court's judgment "on the basis of its well-reasoned opinion," and specifically holding that a court should "consider an indemnity agreement in assigning the priority of liability among overlapping insurance policies");[6] *St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins.*

*Co.*, 365 F.3d 263 (4th Cir.2004) (holding that the insurance policy issued to the insured whose duty it was to indemnify the other insured should be primary with all other policies being excess, despite the fact that all of the insurance policies implicated in the litigation contained "Other Insurance" provisions, noting: "[I]n the end, we largely disregard the parties' free-standing arguments about the various policies, for this case's resolution is controlled by the [insureds' management agreement's] indemnification provisions."); *Am. Indem. Lloyds v. Travelers Prop. & Cas.*, 335 F.3d 429 (5th Cir.2003) (where a subcontractor's commercial general liability (CGL) insurer sued the contractor's CGL insurer, seeking a declaration that it was entitled to recover from the defendant one-half of the amount paid to settle a personal injury lawsuit brought by the subcontractor's employee against the subcontractor and the contractor, holding that the plaintiff was liable for the full amount of the settlement, notwithstanding the existence of an "other insurance" clause in its policy that purported to make its policy "excess-only," because the subcontractor had agreed to indemnify the general contractor for any claim arising out of the subcontractor's work on a construction site); *Wallace v. AMTRAK*, 5 F.Supp.3d 452 (S.D.N.Y.2014) (applying the rule that "an indemnitor (and thus its insurer) bears full responsibility for covered indemnification payments, even if the indemnitee has other insurance covering

---

**6.** In *Chandler,* the language of the policies and the language of the underlying lease agreement concerning which policy would be excess were basically consistent, and the court's ultimate holding was based "both on the plain language of the [dueling] insurance policies, as well as on the indemnity agreement and other evidence." *Chandler,* 2005 WL 5629027, at *6, 2005 U.S. Distr. LEXIS 44426, at *17. Fireman's Fund argues that this case simply stands for the proposition that a true excess policy is only implicated once all other coverage has been exhausted.

Nonetheless, both the district court and the Sixth Circuit clearly adopted the principle that "whether a policy is 'excess' or 'primary' depends not on the labels attached to them, but rather on a determination of who is required to pay first. Where there is an indemnity agreement that sets forth the parties' obligations to one another, that agreement must be consulted and will usually determine the allocation of liability in an insurance dispute." *Id.* at *5, 2005 U.S. Distr. LEXIS 44426, at *14 (citing *Wal–Mart Stores, Inc. v. RLI Ins. Co.,* among others).

the same loss"); *J. Walters Constr. Inc. v. Gilman Paper Co.*, 620 So.2d 219, 221 (Fla.Ct.App.1993) (holding that contractual indemnification clause trumped the "other insurance" provisions in the contracting parties' respective insurance policies, because "to apply the 'other insurance' provisions to reduce [the indemnitor's insurer's liability] would serve to abrogate the indemnity agreement between" the construction company and the building owner) (citing *Aetna Ins. Co. v. Fid. & Cas. Co. of New York*, 483 F.2d 471, 473 (5th Cir.1973) (holding that an indemnity agreement "controls all the rights and obligations of the parties and their privies (the insurers)")).

■ Based on the above-cited cases, the Court finds that, regardless of which state's law applies to the issue, Fireman's Fund's obligation under the Lucky Star Policy is governed primarily by Lucky Star's contractual obligations to SCP, irrespective of whether Fireman's Fund's policy is designated as "excess" as opposed to "primary." As in *Wal–Mart Stores, Inc. v. RLI Insurance Co.*, several factors weigh in favor of that determination. First, the Court has already determined that the 2011 Services Agreement is binding and enforceable. That contract specified that Lucky Star would be responsible for any damage to the Leased Equipment while such equipment was in use and required Lucky Star to obtain insurance to cover such damage, thus supplying a "close factual relationship between the indemnity obligation and the insurance contracts." *Wal–Mart Stores, Inc.*, 292 F.3d at 589–90. Second, there is no evidence that the insurance premium paid by Lucky Star to Fireman's Fund was calculated based on its being excess to any other insurance coverage, and no evidence that Fireman's Fund was aware that the Leased Equipment was also covered by a policy procured by SCP. Third, contrary to Fireman's Fund's representations, to rule

otherwise would result in circular litigation. This risk is not remote: SCP and St. Paul are pursuing claims against Lucky Star to recover damages for breach of contract.

Fireman's Fund attempts to argue that the cases cited above and by St. Paul are not applicable to a "first party property claim where multiples insurers cover the same risk. Every case [cited] in [St. Paul's] motion addresses indemnity agreements where a party agreed to defend and indemnify another against a third-party claim." (ECF No. 92, at 3.) Fireman's Fund insists that "[t]hat sort of indemnity agreement is fundamentally different from the equipment lease agreement between SCP and Lucky Star and the principles do not apply in the first party context." (*Id.*) This is a distinction without a difference. Here, Lucky Star did not agree to indemnify against a third-party claim, but it did agree to be responsible for loss or damage to the Leased Equipment while it was "in use" and to procure insurance for the purpose of making good on this obligation if called upon to do so. The Stage Collapse caused damage to the Leased Equipment. Lucky Star is contractually responsible for that damage, and Fireman's Fund insured that risk.

To the extent there are decisions from other jurisdictions that conclude, to the contrary, that dueling "other insurance" clauses must be construed without reference to the underlying contractual relationship between the insureds, the Court rejects those opinions in favor of the more equitable, just, and reasonable path taken by the Eighth Circuit in *Wal–Mart Stores, Inc. v. RLI Insurance Co.* and the other cases cited herein. In short, the question of whether a policy should be deemed "excess" or "primary" when, as here, all the policies at issue purport to be excess only, must be determined by the insured par-

ties' intentions. In this case, the insureds' intentions regarding whose insurance should be primary and whose excess is clearly manifested by the written agreements between Lucky Star and SCP, and between SCP and Epic. Fireman's Fund's coverage is primary with respect to the damages at issue here.

### 3. The Amount of Fireman's Fund's Liability

Fireman's Fund also posits that summary judgment in favor of St. Paul is not warranted based on disputed issues of fact concerning whether the St. Paul's payments were actually owed under the 2011 Services Agreement, that is, whether the equipment for which St. Paul submitted payment was actually included in the equipment list that was incorporated into the 2011 agreement. "Simply," Fireman's Fund argues, "St. Paul has not shown whether the equipment it valued is scheduled in the agreement. Thus, if the Court analyzes Fireman's Fund's obligations by reference to the agreement, [St. Paul's] motion must be denied." (ECF No. 92, at 20.) [7] In response, St. Paul points out that Fireman's Fund stipulated that SCP provided the equipment identified in Exhibit A to the 2011 Services Agreement.

In relevant part, the parties stipulated as follows:

6. SCP provided the specified equipment and services required under the 2011 Agreement for Services....

8. SCP provided the scheduled equipment as set forth in Exhibit A— Equipment Specifications of the 2011 Agreement for Services for use by [Lucky Star] on the "Incredible Machine Tour," including on August 13, 2011 at the Indiana State Fair in Indianapolis, Indiana.

....

13. As a result of the Stage Collapse, equipment owned by SCP and leased by SCP from Epic for [Lucky Star's] "Incredible Machine Tour" was destroyed.

....

41. As a result of the Stage Collapse, property owned by Epic and leased by SCP for [Lucky Star's] "Incredible Machine Tour" was lost. St. Paul determined that the Actual Cash Value of Epic-owned property was $1,833,193.33....

42. As a result of the Stage Collapse, property owned by SCP was lost. St. Paul determined that the Actual Cash Value of the SCP-owned property was $98,821.71.

....

47. St. Paul paid a total of $1,961,203.66 under the SCP Policy for equipment owned by SCP and leased by SCP from Epic for [Lucky Star's] "Incredible Machine Tour" that was lost in the Stage Collapse.

....

49. Of the amounts that St. Paul paid under the SCP Policy, $1,833,193.33 was paid directly to Epic, at the request of SCP, for damage to property that Epic owned and that SCP had leased from Epic for [Lucky Star's] "Incredible Machine Tour."

50. Of the amounts that St. Paul paid under the SCP Policy, a total of $128,010.33 was paid to SCP for property it owned.

51. Of the amounts that St. Paul paid under the SCP Policy, $29,388.62 was paid in or about December 2013 based on the replacement costs associated with certain items.

---

7. Fireman's Fund expressly does not dispute St. Paul's valuations "for the purposes of analyzing the parties' respective obligations to contribute to the loss if that loss is based entirely on the terms of the Lucky Star policy." (ECF No. 92, at 20.)

(Joint Stipulations, ECF No. 60.) The Court notes that these numbers are somewhat confusing and inconsistent,[8] but it is apparently undisputed that the total paid out by St. Paul is $1,961,203.66 to cover the damages to Epic's and SCP's equipment incurred as a result of the Stage Collapse. This number was based on the calculations and adjustment made by Neil Gibson, an independent with Crawford & Company, who was retained by St. Paul.

Fireman's Fund's argument that St. Paul has "not submitted any evidence to show that it determined whether the equipment it covered and paid for is actually listed in the schedule attached to the 2011 agreement" (ECF No. 92, at 20) is simply specious. Fireman's Fund stipulated that SCP provided to Lucky Star the equipment required by the 2011 Agreement for Services to Lucky Star for use during its Tour, including at the time of the Stage Collapse. It is this equipment, including all its "separate parts" (2011 Services Agreement ¶ 12), that was damaged in the Stage Collapse. Neil Gibson's assessment of the damage to that equipment and his adjustment of the monetary value of that equipment, is unopposed. Fireman's Fund's suggestion that perhaps some of the equipment contributed by SCP and used by Lucky Star during the Tour was not actually itemized on the schedule appended to the 2011 Lease Agreement amounts to pure speculation. It is clear from the record that Gibson's task was to identify the equipment belonging to Epic and SCP used by Lucky Star on the night of the Stage Collapse and to assess its value. Fireman's Fund has not pointed to any item whose value was assessed by Gibson and included in his adjustment figure that was not on the equipment list or suggested why SCP would supply equipment that it was not contractually obligated to supply. Because St. Paul's evidence regarding the equipment and its value is unopposed, Fireman's Fund has not succeeded in establishing the existence of a material factual dispute as to the amount of damage caused by the Stage Collapse.

## V. CONCLUSION

The Court finds, as set forth herein, that the 2011 Services Agreement is valid and enforceable, and that Lucky Star is contractually responsible to SCP under that agreement for the damage to the Leased Equipment that occurred during the 2011 Stage Collapse. The Court will therefore grant summary judgment to SCP and St. Paul on those two issues, reserving the issue of damages.

That conclusion largely dictates the outcome of the dispute between the insurance companies. St. Paul is entitled to judgment in its favor on the basis that Fireman's Fund has the primary obligation to pay for the property damage at issue under the coverage provided by the Lucky Star Policy, based on the indemnification provision contained in the 2011 Services Agreement between Lucky Star and SCP, which the Court has found to be enforceable.

---

8. The parties stipulated that St. Paul paid out a total of $1,961,203.66 to both SCP and Epic to cover their losses, and that $1,833,193.33 went to Epic. Subtracting that figure from the total, it would appear that $128,010.33 was paid to SCP for loss of equipment it owned. However, the parties also stipulate that St. Paul initially paid $98,827.71 to SCP based on the assessed value of the damaged equipment, but then supplemented that figure with a subsequent payment of approximately $29,388.62 based on actual replacement costs. However, $98,827.71 plus $29,388.62 equals $128,216.33 rather than $128,010.33, a difference of $206. St. Paul refers to the affidavit of Neil Gibson in its motion papers. That affidavit, which might have explained this discrepancy, does not appear to be in the Court's record. Because the discrepancy is the fault of St. Paul but inures to Fireman's Fund's benefit, the Court finds it to be immaterial.

St. Paul also seeks a determination that, because Fireman's Fund's coverage under the Lucky Star Policy is primary, payments made by St. Paul in adjustment of SCP's claims were reasonable and establish the amount for which Fireman's Fund is liable. St. Paul expressly requests that this Court grant summary judgment in St. Paul's favor "as to all claims asserted by Plaintiff and award St. Paul a judgment for $1,961,203.66 plus any additional relief to which it may be entitled." (ECF No. 67, at 2.)

The Court finds that St. Paul is entitled to summary judgment in its favor "as to all claims asserted by Plaintiff." That is, insofar as Fireman's Fund seeks a declaration "as to the amounts that Fireman's Fund is obligated to pay for the property damage under the [Lucky Star] Policy," the Court will issue a judicial declaration that Fireman's Fund is obligated under the Lucky Star Policy to submit full payment of the loss as calculated and adjusted by Neil Gibson on behalf of St. Paul: $1,961,203.66.

Fireman's Fund's motion for summary judgment in its favor will be denied, for the reasons set forth herein. The Court finds that Fireman's Fund's coverage obligations under the circumstances presented by this case are primary and that Fireman's Fund has an obligation to contribute to St. Paul the full amount of the payments St. Paul made to SCP and Epic for their losses in the Stage Collapse.

An appropriate order is filed herewith.