NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0347n.06

Case No. 21-5858

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 22, 2022
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| LANDMARK AMERICAN INSURANCE COMPANY, | ) |
| Plaintiff-Appellee, | ) |
| v. | ) |
| HECO REALTY, LLC, | ) ON APPEAL FROM THE |
| | ) UNITED STATES |
| Defendant, | ) DISTRICT COURT FOR |
| | ) THE WESTERN DISTRICT |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, | ) OF TENNESSEE |
| Defendant-Appellant. | ) OPINION |

Before: MOORE, WHITE, and BUSH, Circuit Judges.

JOHN K. BUSH, Circuit Judge. Heckethorn Manufacturing rented commercial property from HECO Realty, LLC, in Dyersburg, Tennessee. To comply with its lease, Heckethorn bought commercial property insurance from Liberty Mutual Fire Insurance Company. And when Heckethorn's business looked to be on the brink of shutting down, HECO bought insurance of its own from Landmark American Insurance Company. So both Liberty Mutual and Landmark covered the property in late spring 2019, when a company damaged it while removing Heckethorn's equipment. But when presented with HECO's claim for the damages, both insurers claimed that the other had to pay first. We must now decide how the Tennessee Supreme Court would likely resolve Landmark and Liberty Mutual's coverage dispute.

1

I.

HECO leased its commercial property to Heckethorn for twenty-three years. Their relationship came to an early end when Heckethorn stopped making rent payments. Nevertheless, HECO and Heckethorn's relationship remains central to Landmark and Liberty Mutual's dispute over their respective insurance contracts. So we start with the terms of the 1996 lease itself.

Two aspects of the lease matter most here. The first is Heckethorn's promise to procure insurance coverage. Under the heading "Fire Insurance," Heckethorn agreed to "pay for and maintain insurance against loss or damage by fire and such other risks and hazards as are insurable under present and future standard forms of fire, rent, and extended coverage insurance policies, in an amount sufficient to prevent [HECO] from becoming a co-insurer under the terms of the applicable policies[.]" Lease § 7(a), R. 1-4, PageID 38. On top of meeting certain quality and coverage requirements, the policy also had to name HECO an additional insured. *Id.* § 7(b), PageID 38.

So Heckethorn paid for what it needed by purchasing property insurance coverage from Liberty Mutual. The policy at issue was effective from October 30, 2018, to October 30, 2019. It provided "coverage on a replacement cost basis" for "risks of direct physical loss or damage to" real property or personal property (of the insured and others), and for equipment breakdown, loss of business income, and extra expense. Liberty Mutual Policy, R. 1-7, PageID 204. Including equipment breakdown, Liberty Mutual's real-property liability was limited to $12,252,472. The policy also listed HECO as an additional insured, and Heckethorn assigned its rights under the policy to HECO when their lease agreement terminated.

In another section of the lease—labeled "Liability Insurance & 'Hold Harmless' Agreement"—Heckethorn also agreed to maintain "public liability insurance" naming HECO an

additional insured. Lease § 8(a)–(c), R. 1-4, PageID 39–40. Heckethorn and HECO further agreed to each "be responsible for, and . . . defend, indemnify, and hold harmless the other party against and from any and all liability, claim of liability, or expense arising out of," among other things, its own negligent, reckless, or intentional conduct. *Id.* § 8(d), PageID 40. The record does not reflect whether Heckethorn complied with this provision, but neither party argues that Heckethorn bought the Liberty Mutual policy to comply with this part of the lease.[1]

The second key feature of the lease is a collection of promises by Heckethorn to bear responsibility for certain damages. It accepted that responsibility, by our count, six times:

- A clause providing that any recovery under Heckethorn's above-mentioned insurance policy would be paid to HECO. Lease § 7(b)(A), R. 1-4, PageID 38.

- A section prohibiting certain uses of the premises and requiring that Heckethorn indemnify HECO for any losses resulting from a prohibited use. *Id.* § 11(b), PageID 43.

- A clause specifying that Heckethorn "shall be responsible for 100 % of the repair, replacement, and maintenance of the Premises, *whether structural or non-structural*." *Id.* § 13(a), PageID 45–46.

- A section absolving HECO of "any duty to replace, repair, maintain, alter, [or] to take any other action with respect to the premises" and expressly disclaiming HECO's liability for damages caused by "any acts or omissions" of Heckethorn or other occupants, "losses by theft," and "the criminal acts, if any, of third parties to, in, or near the Premises." *Id.* § 13(b), PageID 46.

- A section requiring Heckethorn to indemnify HECO for roof-leak (or other) damages caused by a "Roof Cut," or "any penetration into the roof[.]" *Id.* § 14(b), PageID 47.

- And a section tasking Heckethorn with repairing "all such damage to the Premises that arises from or out of the removal of trade fixtures by Tenant" and reimbursing HECO "for all such damage not repaired." *Id.* § 15(b)(C), PageID 48.

---

[1] In fact, neither party references this section of the lease.

Heckethorn had the option to cover some of the above costs by purchasing renters' insurance for itself. Nothing in the record reveals whether it did so.

Such was the lease at formation and in operation; this dispute arises from events surrounding its untimely termination. The parties ended the lease when Heckethorn could no longer pay its rent. Heckethorn's financial difficulties began in 2017. Those difficulties fluctuated, but by the end of 2018, a manager at HECO knew that "there was a very high likelihood that Heckethorn would, at some point in 2019, cease to be in operations." Mellendick Examination, R. 51-5, PageID 817. He was right. Heckethorn closed shop at the end of April 2019 and was off HECO's property by July 3.

Heckethorn's financial difficulties risked a lapse in insurance coverage for HECO's property. But the "potential . . . headache" of overlapping policies was better than "no insurance at all." Mellendick Examination, R. 62-3, PageID 1122. So HECO procured a commercial property policy of its own from Landmark. That policy covered "direct physical loss of or damage to" three buildings and select personal property within them "caused by or resulting from" a covered loss, along with providing business-income coverage. Landmark Policy, R. 1-6, PageID 153. Altogether, it limited coverage to $12 million for damages to the buildings.

One detail in Landmark's policy matters perhaps most: It kicked in on May 1, 2019— almost six months before Liberty Mutual's policy would lapse. That coverage overlap begot this coverage dispute.

The claims as to which Landmark and Liberty Mutual dispute coverage grew out of Heckethorn's financial troubles. In short, Heckethorn had debts to pay. It relied on a loan from one of its customers, Teneco Automotive Operating Company, to keep "afloat" while it struggled. Mellendick Examination, R. 51-5, PageID 817. As collateral, Heckethorn gave Teneco "all of the

4

personal property and Trade Fixtures" it "now owned or hereafter acquired[.]" Surrender Agreement, R. 51-4, PageID 794–95; *see also id.* at 803–12 (describing the collateral). So when Heckethorn defaulted on its loan from Teneco, it surrendered all that collateral. Per the surrender agreement, Heckethorn made all of it available to Teneco's hired auctioneers, the Levy Recovery Group, at HECO's property.

Levy Recovery Group conducted the auction. The trade fixtures sold included Heckethorn's equipment. Once sold, that equipment had to be removed from HECO's property. So Levy Recovery Group hired Bulldog Group, a "rigging company," to remove the auctioned-off equipment and "mak[e] the system safe" after the removal. Mellendick Examination, R. 51-5, PageID 820–21. As far as HECO's manager knew, Teneco made clear to Levy Recovery Group that it "was not to remove the entire electrical system" when removing the equipment. *Id.* at PageID 824.

So HECO was surprised to find "considerable damage to equipment" and missing "cable and wiring[.]" Continental Machinery Report, R. 51-8, PageID 834. HECO had sent its contractor to check the property's electrical system, after the equipment removal in early August 2019, to make sure it could safely operate. It discovered that "hundreds of feet of copper" were missing "from the ceiling[.]" Mellendick Examination, R. 51-5, PageID 819. According to electrical engineering experts that HECO hired from Continental Machinery Company, a theft of that size "would have taken weeks to execute." *Id.* HECO blamed Bulldog Group—the only actor it says had the time and know-how to pull of such a heist in May or June 2019.

The damage was expensive. It would cost $2,273,563.13 to repair the property, according to Continental Machinery.[2] HECO submitted claims for that damage to both Landmark and

---

[2] Landmark thinks this figure is an overestimation of damages.

Liberty Mutual in September 2019. Liberty Mutual settled HECO's claim for $1,675,000 and assumed the rights to any payout to HECO from its Landmark policy.

But payment has not come. By the time Liberty Mutual settled with HECO, Landmark had sued seeking a declaration that it had no duty to cover HECO's loss, for six reasons. It alleged that HECO failed to abide by the requirements of its policy, that the property involved was not covered, that damages preexisting Bulldog's alleged theft had to be calculated, that its policy does not cover theft-related damages, that coverage is limited to actual cash value of damages, and, finally, that Liberty Mutual owed primary coverage.

Landmark moved for summary judgment on that last ground—that Liberty Mutual had to pay first. Landmark argued that because Heckethorn agreed to cover certain losses and procure insurance in its lease with HECO, Heckethorn's insurer, Liberty Mutual, had to be the primary insurer. Meantime, Liberty Mutual moved for summary judgment, too, but asked the district court to ignore the lease and look only to the insurance policies. Both policies contained "other insurance" clauses, which insurance companies include to protect themselves from insureds seeking excess coverage for a single loss. 15 Steven Plitt et al., *Couch on Insurance* § 219:1 (Rev. 3d ed. 2021). Those clauses often explain that a policy is either "pro rata" (and pays its share when there is other insurance) or "excess" (and pays only when the other policy is exhausted). *Id.* § 219:5.[3]

The specific "other insurance" provisions at issue are best read in full. First, Liberty Mutual's policy limited coverage when another policy would apply in its absence:

---

[3] An "escape" clause absolves an insurer of any liability when other insurance covers a loss, *id.* § 219:5, but no one argues this type of clause is at issue.

    **Q.** Other Insurance

        **1.** If there is any other insurance that would apply in the absence of this policy, **we** will pay for a **covered loss** only after the limits of all other applicable insurance are exhausted.

        **2.** If this policy is deemed by law to contribute to a loss with other insurance, **we** will pay only **our** proportionate share of the loss, up to the applicable **limit of liability**. **Our** share will be the proportion that the applicable **limit of liability** of this policy bears to the total applicable **limits of liability** available from all insurance.

        **3.** **You** are permitted to have other insurance over any limits or sublimits of liability specified in this policy.

        **4.** The existence of such insurance will not reduce any limit or sublimit of liability in this policy.

        **5.** To the extent this policy replaced another policy, coverage under this policy shall not become effective until such other policy has terminated.

Liberty Mutual Policy, R. 1-7, PageID 233. And Landmark included its own "other insurance"

language as a commercial-property condition:

    **G. OTHER INSURANCE**

        **1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

        **2.** If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

Landmark Policy, R. 1-6, PageID 178. To Liberty Mutual, the plain language of both policies

made Landmark's coverage pro rata and its own coverage excess, so Landmark was the primary

insurer. And at the very least, Liberty Mutual asked the district court to prorate the coverage.

7

II.

This appeal follows the district court's grant of summary judgment to Landmark. *Landmark Am. Ins. Co. v. HECO Realty, LLC*, 554 F. Supp. 3d 910, 929 (W.D. Tenn. 2021). The district court reasoned that the "other insurance" clauses are in direct conflict; it thus found them "mutually repugnant" under Tennessee law. *Id.* at 918–22. But it also found that the Tennessee Supreme Court would no longer require proration of coverage when "other insurance" clauses conflict. *Id.* at 922–23. Instead, the district court decided that the Tennessee Supreme Court would likely resolve the dispute by looking at Heckethorn's obligations under its lease with HECO, and it held that Liberty Mutual, as Heckethorn's insurer, owes primary coverage. *Id.* at 923–28.

We review the district court's decision de novo. *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019). Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And because both parties moved for summary judgment, we construe all evidence and draw all reasonable inferences against the party whose motion we are reviewing. *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

III.

Tennessee substantive law governs this dispute. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). Usually, "[w]hen resolving an issue of state law, 'we look to the final decision of the state's highest

court[.]" *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)).

But Landmark and Liberty Mutual agree that no Tennessee Supreme Court decision resolves their coverage dispute. So our answer to this question of Tennessee law will be an "*Erie* guess." *Id.* That means we must make our best prediction of how the Tennessee Supreme Court, "if presented with the issue, would resolve it." *Id.* Several data points are especially relevant to that inquiry. First, when "the only precedent is from the state's intermediate appellate courts," we follow their lead "absent a strong showing that the state supreme court would act in a different manner." *Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 433 (6th Cir. 2004). We also look to other "relevant data," which include restatements of law, commentary from law reviews, and the majority rule applicable to the question. *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985) (citations omitted).

And we are ever mindful that our resolution "cannot escape being a forecast rather than a determination." *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 499 (1941). So we will "proceed with caution when making pronouncements" of Tennessee law, deploying a "proper reluctance to speculate on any trends of state law." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) (quotations omitted).

IV.

A. Tennessee Contract Interpretation

We turn first to the basics of Tennessee contract law. Tennessee courts start and, if possible, end with the text of a contract when resolving contract disputes. *See Ray Bell Constr. Co. v. Tennessee*, 356 S.W.3d 384, 387 (Tenn. 2011). And insurance contracts are treated no differently. *See Am. Just. Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn. 2000).

9

Consequently, when "interpret[ing] contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles," "the written words" are "the lodestar of contract interpretation." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 688, 694 (Tenn. 2019) (citations omitted).

But ambiguities compel Tennessee courts to "place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described." *Id.* at 694 (quoting *Staub v. Hampton*, 101 S.W. 776, 785 (Tenn. 1907)). And where an insurance contract is ambiguous, "the meaning favorable to the insured controls." *Lammert v. Auto-Owners (Mut.) Ins. Co.*, 572 S.W.3d 170, 173 (Tenn. 2019) (quoting *Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012)). Even so, "[a] strained construction may not be placed on the language used to find ambiguity where none exists." *Id.* (quoting *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)).

B.  The Lease

With those guiding principles established, our next task is to answer whether the lease between Heckethorn and HECO determines priority of coverage. Landmark says it must: holding otherwise would "void" the terms of the lease obligating Heckethorn to procure property insurance and shifting responsibility for certain losses to Heckethorn. *See* Appellee Br. at 24. In Landmark's view, Liberty Mutual "recognized the burdens placed on Heckethorn" under the lease when it provided its insurance policy. *Id.* at 18. But Liberty Mutual objects. Unlike commercial general liability (CGL) insurance, which often covers an insured's indemnification agreements, the property insurance here "provides no such coverage[.]" Appellant Br. at 22–24. So Liberty Mutual contends that Tennessee courts would not look to the lease to resolve this dispute.

Landmark offers persuasive authority to support its position. The majority rule is that "[a]n 'other insurance' clause may be circumvented by effect of a contract or rule of law." 15 *Couch* § 219:1. One example is "an indemnity agreement between the insureds or a contract with an indemnification clause," which "may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy." *Id.* Indeed, courts have often rejected the argument "that only the language of insurance policies determine[s] the priority of payment between insurers," finding "no authority for the proposition that a court may never consider an indemnity clause in determining liability for a settlement." *Wal-Mart Stores v. RLI Ins. Co.*, 292 F.3d 583, 588 (8th Cir. 2002).[4]

But we are not persuaded that the Tennessee Supreme Court would hold that HECO and Heckethorn's lease controls this coverage dispute. Two essential elements are reflected in the record of nearly every case applying the majority rule: an indemnity obligation assumed by the insured *and* an insurance contract covering that indemnification agreement. In other words, to apply the majority rule here, we need evidence that Liberty Mutual intended its insurance policy to cover Heckethorn's lease obligations. None is reflected in the record here.

A closer look at the cases holding that an underlying contract does control in a coverage dispute reveals why HECO and Heckethorn's lease does not. Take *Wal-Mart Stores*. There, Cheyenne sold lamps to Wal-Mart for Wal-Mart to sell in its stores. 292 F.3d at 585. And

---

[4] The Eighth Circuit's decision in *Wal-Mart Stores* is the most-cited example of a court adopting the rule spelled out in *Couch* and cited above. But several of our sister circuits, district courts, and state courts have held likewise. *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 365 F.3d 263, 272–73 (4th Cir. 2004); *Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co.*, 335 F.3d 429, 436 (5th Cir. 2003); *Fireman's Fund Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 182 F. Supp. 3d 793, 819–22 (M.D. Tenn. 2016); *Chubb Ins. Co. of Canada v. Mid-Continent Cas. Co.*, 982 F. Supp. 435, 438 (S.D. Miss. 1997); *Star Ins. Co. v. Cont'l Res., Inc.*, 89 F. Supp. 3d 1015, 1028 (D.N.D. 2015); *St. Paul Fire & Marine Ins. Co. v. Lexington Ins. Co.*, No. 05-80230-CIV, 2006 WL 1295408, at *4–5 (S.D. Fla. Apr. 4, 2006); *West Bend Mut. Ins. Co. v. MacDougall Pierce Constr., Inc.*, 11 N.E.3d 531, 546 (Ind. Ct. App. 2014); *Hertz Equip. Rental Corp. v. Ammon Painting Co.*, No. WD 70191, 2009 WL 2365578, at *12–13 (Mo. Ct. App. 2009); *Hartford Cas. Ins. Co. v. Mt. Hawley Ins. Co.*, 123 Cal. App. 4th 278, 298 (2d Dist. 2004).

Cheyenne further agreed to indemnify Wal-Mart from liability related to the sale of its lamps and to procure at least $2 million in liability insurance. *Id.* Its insurer, RLI Insurance Company, "provided liability insurance to Cheyenne that cover[ed] . . . Cheyenne's indemnification obligation." *Id.* at 587; *accord Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 163 F. Supp. 2d 1025, 1037 (W.D. Ark. 2001) ("Each policy . . . provided coverage to the insured for all sums the insured became legally obligated to pay as damages as a result of the occurrence[.]"). Given the "close factual relationship" between the insurance contract and the indemnification agreement, the Eighth Circuit concluded that the former was bought to insure the latter, so the underlying indemnification agreement was relevant to the coverage dispute. *Wal-Mart Stores*, 292 F.3d at 589–90.

Other circuits apply the majority rule in similar circumstances. The Fourth Circuit resolved a Virginia coverage dispute between the insurers of the owner and operator of a resort in *St. Paul Fire & Marine Insurance Co. v. American International Specialty Lines Insurance Co.*, 365 F.3d 263, 266 (4th Cir. 2004). Relevant there, the owner agreed to indemnify the operator for ordinary negligence. *Id.* But before letting that agreement govern the coverage dispute, the Fourth Circuit looked to whether the owner's insurance policies covered its "obligation to indemnify" the operator. *Id.* at 276. Answering that it did, the court relied on the indemnification agreement to resolve the coverage dispute. *Id.* Like the Fourth Circuit, the Fifth Circuit in *American Indemnity Lloyd's v. Travelers Property & Casualty Insurance Co.* looked to an underlying agreement only when a subcontractor's insurance "expressly cover[ed the subcontractor's] liability to [the contractor] under the subcontract's indemnity provision[.]" 335 F.3d 429, 441 (5th Cir. 2003).

And the several district court cases applying the majority rule take the same approach. *See, e.g.*, *Star Ins. Co. v. Cont'l Res., Inc.*, 89 F. Supp. 3d 1015, 1029 (D.N.D. 2015) ("An indemnitor and its insurer bear full responsibility for *covered* indemnification payments[.]" (emphasis

12

added)); *Chubb Ins. Co. of Canada v. Mid-Continent Cas. Co.*, 982 F. Supp. 435, 438 (S.D. Miss. 1997) ("[T]o the extent that Smith Brothers is liable to Coho for indemnity, so, too, are its insurers, *to the extent that their policies provide coverage for Smith Brothers' indemnity liability*." (emphasis added and citations omitted)); *cf. Ironshore Specialty Ins. Co. v. Aspen Underwriting Ltd.*, 40 F. Supp. 3d 807, 810–11 (W.D. Tex. 2014); *St. Paul Fire & Marine Ins. Co. v. Lexington Ins. Co.*, No. 05-80230-CIV, 2006 WL 1295408, at *1 (S.D. Fla. 2006). Further, in *Fireman's Fund Insurance Co. v. St. Paul Fire & Marine Insurance Co.*, the district court, applying Tennessee law, held that because a company bore "contractual responsibility" for damage "and Fireman's Fund insured that risk[,]" Fireman's Fund had to cover the loss. 182 F. Supp. 3d 793, 822 (M.D. Tenn. 2016). A look to the record there reveals that the insurance contract covered the insured's underlying liability. *See* Lucky Star Policy, *Fireman's Fund Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:12-cv-0851 (M.D. Tenn. May 13, 2013), ECF No. 26-8, PageID 575, 587–88.

Those cases clarify when the majority rule applies. If "the particular facts of the case, such as the intentions and relationships of the parties" call for it, courts hold that a covered, underlying agreement between two insured parties controls a coverage dispute. *Wal-Mart Stores*, 292 F.3d at 588–89. We have little reason to doubt that the Tennessee Supreme Court might adopt the majority rule if presented with a similar case. But this case is not like those cited above, for two main reasons.

*First*, Liberty Mutual accepted none of Heckethorn's contractual liability in its insurance contract. The policy itself is silent about Heckethorn's obligation to cover the costs of damage to the property. The parties also agree that the record lacks evidence that either insurer was aware of the terms of the lease. But does the Liberty Mutual policy's silence on Heckethorn's indemnity

13

obligations mean it does not cover them? Landmark says no. In its view, a tenant's insurer always steps into the shoes of its insured when it knows that the lease requires property insurance.[5]

Of course, Liberty Mutual disagrees. It points to a simple explanation for why mention of Heckethorn's lease obligations is absent from its policy: coverage of underlying liabilities is common in CGL insurance but not in property insurance. As Liberty Mutual notes, standard CGL insurance policies contain limited contractual-liability exclusions. 9A *Couch* § 129:33. Such a clause typically provides that the insurance "does not apply to bodily injury or property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." *Id.* But that exclusion does not apply to obligations assumed in an "insured contract." *Id.* And sometimes, a "lease of premises" is in the definition of "insured contract." *Id.* at n.3 (citing *Penn. Mfrs. Indem. Co. v. Pottstown Indus. Complex LP*, 215 A.3d 1010, 1018 (Pa. Super. Ct. 2019)).

We agree with Liberty Mutual that this missing language is critical. Nearly all the cases applying the majority rule involve insurance policies accepting some contractual liability. And the cases lacking explicit evidence of that language provide it implicitly—they leave no doubt that the insurer covered the insured's underlying indemnification obligations.[6] Whether or not Liberty

---

[5] We could quibble with the argument that Heckethorn's asking to name HECO an additional insured under the Liberty Mutual policy proves that Liberty Mutual knew the elements of the lease. That specific knowledge is missing from the record.

In any event, Landmark's argument begs the question. It cites the *Wal-Mart Stores* rule as authority for its position that a silent insurance contract can still be interpreted to hold an insurer responsible for its insured's underlying liability. But, as explained above, the insurance policy in *Wal-Mart Stores* was *not* silent on this point. 292 F.3d at 587. Our question is thus whether to apply the majority rule at all. Landmark's simple invocation of that rule fails to answer that question.

[6] The parties point us to one case that does neither: *RBP, LLC v. Genuine Parts Co.*, No. 1:04-cv-1154, 2006 WL 8435065 (W.D. Tenn. Aug. 7, 2006). In *RBP*, the tenant signed a lease in which it agreed to both indemnify the landlord and procure casualty insurance. *Id.* at *1. So to resolve a priority-of-coverage dispute, that district court relied on those two promises to decide that, under the majority rule, the tenant's insurer had to pay. *Id.* at *14–15. The policy in *RBP* was like Liberty Mutual's: it did not cover the insured's indemnity obligations. Yet that district court treated the case as a straightforward application of the majority rule. *Id.*

Mutual is right that property insurance never includes a contractual-liability exclusion and CGL insurance always does,[7] *this* property insurance does not include that language, or any other indication that it covers Heckethorn's lease obligations.

*Second*, the connection between the indemnity provisions and the insurance requirements in the lease is tenuous at best. Courts applying the majority rule look for "a close factual relationship between the indemnity obligation and the insurance contracts." *Wal-Mart Stores*, 292 F.3d at 589–90. We need not find that Heckethorn bought insurance from Liberty Mutual "specifically for" its indemnity obligations, *id.* at 587 (internal quotation omitted), but we do need some evidence that it did so "for the purpose of making good on" them, *Fireman's Fund*, 182 F. Supp. 3d at 822. No close factual relationship is apparent from the record here.

What were the relevant obligations? The lease assigned Heckethorn responsibility to pay for "100% of the repair, replacement, and maintenance of the Premises" and to repair or pay for "all such damage to the Premises that arises from or out of the removal of trade fixtures by Tenant." Lease §§ 13(a), 15(b)(C), R. 1-4, PageID 45, 48. It also removed HECO's responsibility to take any action or accept any liability if the property were damaged by Heckethorn's "acts or omissions" or by theft or other criminal acts. *Id.* § 13(b), PageID 46. And the supposedly related insurance requirement? Heckethorn promised to "pay for and maintain insurance" covering "loss or damage by fire and such other risks and hazards[.]" *Id.* § 7(a), PageID 38. Coverage had to be

---

Liberty Mutual says the *RBP* court was simply wrong for missing the distinction between insurance that covers insured contracts and insurance that does not. Maybe so. But the insurer in *RBP* only hinted at that argument, *see* Response in Opposition, *RBP, LLC v. Genuine Parts Co.*, No. 1:04-cv-1154 (W.D. Tenn. Feb. 6, 2006), ECF No. 209, PageID 2126, and, in any event, we are not bound by the decisions of district courts in determining how the Tennessee Supreme Court would handle Landmark and Liberty Mutual's dispute.

[7] *See, e.g.*, Landmark Policy, R. 1-6, PageID 184 (providing coverage in a property-insurance policy for "a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery" in some cases).

enough to keep HECO "from becoming a co-insurer," and HECO had to be named as an additional insured. *Id.* § 7(a)–(b), PageID 38.

But the lease lacks one key feature: it is never clear that the insurance policy required by section 7 of the lease was intended to cover Heckethorn's obligations in sections 13 and 15.[8] Compare that to the underlying agreements in cases applying the majority rule. In those contracts, the promises to obtain liability insurance were directly related to the promises to relieve others from liability. *See, e.g.*, *Wal-Mart Stores*, 292 F.3d at 585, 589–90; *St. Paul Fire & Marine*, 365 F.3d at 266, 276; *Fireman's Fund*, 182 F. Supp. 3d at 822. All HECO and Heckethorn's lease proves is that Heckethorn had to pay certain repair costs and had to purchase the insurance policy issued by Liberty Mutual. Landmark's only means of connecting those two requirements is by surmise (it asks that we acknowledge "how business works," *see* Oral Argument at 21:40–21:58), not by the words of the lease itself. But supposition does not create the required "close factual relationship" between Heckethorn's indemnity obligations and insurance requirements here. *Wal-Mart Stores*, 292 F.3d at 589–90. For that reason, and because Liberty Mutual's policy accepts no contractual liability, this case is distinct from the majority-rule cases.

And those two distinctions are critical. After all, our task here is to faithfully apply Tennessee law. It has set a clear guardrail: we may not adopt a meaning of the insurance contract completely untethered from "the written words" it contains. *Individual Healthcare Specialists*, 566 S.W.3d at 694 (citations omitted). Yet none of the contracts before us contains any indication that Heckethorn purchased the Liberty Mutual policy to cover its obligation to pay for certain damages or that Liberty Mutual issued the policy to cover Heckethorn's contractual liability.

---

[8] A more obvious connection may be made between the indemnity obligations and the insurance required by section 8—where Heckethorn promised to maintain "public liability insurance" and both parties agreed to indemnify the other, Lease § 8, R. 1-4, PageID 39–41—but neither party addressed that provision here or below. *See supra* at 3.

In other words, nothing in the record suggests that we can extend the majority rule to this case without contravening Tennessee contract law.

Nor does Landmark's appeal to Tennessee automobile-insurance law and to principles of equity change our disinclination to extend the majority rule to this case. For one, Tennessee's relevant automobile-insurance law applies when a lessee has purchased insurance to satisfy a specific term of the lease requiring liability insurance. Tenn. Code Ann. § 56-7-1101(c). So the "close factual relationship" between the lease and the insurance missing from this case is necessarily present in the automobile-insurance context. *Wal-Mart Stores*, 292 F.3d at 589–90. And we do not find that a balance of the equities favors requiring Liberty Mutual to provide primary coverage because of the lease between HECO and Heckethorn.

In short, Landmark has failed to offer evidence that the majority rule fits this case. Its brief says that Liberty Mutual's policy "recognizes the burdens placed on Heckethorn under the negotiated terms of the Lease." Appellee Br. at 18. Tellingly, Landmark gives no record citation to support that statement—and it has not told us where else to look for evidence that Liberty Mutual agreed with Heckethorn to cover the indemnity provisions in the lease. We are not inclined to make the *Erie* guess that the Tennessee Supreme Court would extend the majority rule to a case like this one, where there is no evidence that the insurer has accepted its insured's contractual liability. So we must look to the "other insurance" clauses to resolve this dispute.

C. The "Other Insurance" Clauses

"Other insurance" clauses "define the sum" owed by insurers when "multiple insurance policies cover the same injury." *Shelter Mut. Ins. Co. v. State Farm Fire & Cas. Co.*, 930 S.W.2d 570, 572 (Tenn. Ct. App. 1996). Yet the resulting "contractual contest" often causes an insured's rights to "become badly obscured, if not defeated[.]" *United Servs. Auto. Ass'n v. Hartford*

17

*Accident & Indem. Co.*, 414 S.W.2d 836, 840 (Tenn. 1967). We must determine whether we can resolve such a contractual contest here.

To start, we ask "which policy[,]" if any, "provides primary coverage." *Shelter*, 930 S.W.2d at 572. Tennessee courts once applied "a blanket rule that 'other insurance' provisions [a]re null and void in all circumstances." *Id.* at 573. But they now take the majority approach, which "allows the courts to consider the fact[s] of individual cases[.]" *Id.* at 574. It presumes that "other insurance" clauses are "not necessarily repugnant[,]" looking in each case to "the language used in the respective policies." *Sentry Select Ins. Co. v. Tenn. Farmer's Mut. Ins. Co.*, No. M2020-00110-COA-R3-CV, 2021 WL 4352537, at *5 (Tenn. Ct. App. Sept. 24, 2021) (citing *Jones v. Medox, Inc.*, 430 A.2d 488, 493 (D.C. 1981)). The *Shelter* court described the approach Tennessee courts continue to take:

> When strict construction of the "other insurance" clauses results in the conclusion that no primary coverage exists, courts are quick to strike down both "other insurance" clauses as repugnant to each other. This is true, for example, when two policies each have excess clauses as to the same event so that each attempts to pass primary responsibility for coverage on to the other company. On the other hand, when it is clear from a reading of the two competing policies which policy is primary, there is no need for courts to intrude because the general rules of contract come into play.

*Shelter*, 930 S.W.2d at 572; *accord Sentry Select*, 2021 WL 4352537, at *7.

Liberty Mutual argues that *Sentry Select* "mandates reversal here." Appellant Br. at 14. It claims the policies considered there were "nearly identical" to those before us and, because its policy is "strictly excess and is not 'other insurance' as contemplated by the Landmark Policy," Landmark's policy must be primary. *Id.* at 12–15. We disagree.

*Sentry Select* involved a single insured, Terry Jenkins. 2021 WL 4352537, at *1. He insured farm equipment through three policies issued by Sentry Select Insurance Company and, when he became concerned his coverage was inadequate, added the equipment to an existing

policy covering his farm issued by Tennessee Farmer's Mutual Insurance Company. *Id.* The "other insurance" clause in Sentry's policy was identical to the one found in Landmark's policy. *Id.* at *2. And the Farmer's Mutual policy had an "other insurance" clause stating that "[i]nsurance provided by this endorsement is excess over any other insurance and will apply only if the limits of all other insurance have been exhausted solely by payment of loss. However, if other insurance is specifically written as excess insurance over the insurance provided by this endorsement, the limits of this insurance shall apply first." *Id.*

In that case, the Tennessee Court of Appeals "determined that it is possible to read the clauses in harmony to determine which insurance was intended as the primary insurance." *Id.* at *7. Looking to both subsections of Sentry's policy, it held that the policy "does not contemplate circumstances where the other insurance is written strictly as excess because such a policy would not pay first in any event[,]" so it could not be given "a plausible reading if the 'other insurance' to which it refers is written as excess." *Id.* at *8. On the other hand, it found that "the Farmer's Mutual policy is written strictly as excess because it plainly states that it 'is excess over any other insurance' and will apply 'only if the limits of all other insurance have been exhausted'; it will not pay otherwise." *Id.* (emphasis omitted). So Sentry's "other insurance" limits did not apply. *Id.*

But unlike the Farmer's Mutual policy in *Sentry Select*, Liberty Mutual's policy was not written as strictly excess. Consider some key differences: Farmer's Mutual's policy was "excess over any other insurance," *id.* at 2; the Liberty Mutual policy is excess where "there is any other insurance that would apply in the absence of this policy," Liberty Mutual Policy, R. 1-7, PageID 233. Farmer's Mutual's policy accepts primary responsibility only "if other insurance is specifically written as excess insurance" over it, *Sentry Select*, 2021 WL 4352537, at *2; the

Liberty Mutual policy agrees to prorate where "this policy is deemed by law to contribute to a loss with other insurance," Liberty Mutual Policy, R. 1-7, PageID 233.

In some ways, Liberty Mutual's "other insurance" clause is more like the clause found in Landmark's policy. Both prorate—Landmark when there is "other insurance subject to the same plan, terms, conditions and provisions[,]" Landmark Policy, R. 1-6, PageID 178; Liberty Mutual when the policy "is deemed by law to contribute to a loss with other insurance," Liberty Mutual Policy, R. 1-7, PageID 233. And both pay only excess coverage in certain instances—Landmark when other insurance covers "the same loss or damage" but is not "subject to the same plan, terms, conditions and provisions[,]" Landmark Policy, R. 1-6, PageID 178; Liberty Mutual where "other insurance would apply in the absence of this policy," Liberty Mutual Policy, R. 1-7, PageID 233. Simply put, that language cannot be harmonized as easily as the language discussed in *Sentry Select*.

A final issue—left unaddressed in *Sentry Select*—is whether Liberty Mutual's policy counts as "other insurance subject to the same plan, terms, conditions and provisions" as the Landmark policy. Landmark Policy, R. 1-6, PageID 178. If it is, Landmark will prorate coverage. *Id.* Liberty Mutual insists that this clause applies here. But its main support—a recent case from the Eastern District of New York, *Ocean Harbor Casualty Insurance Co. v. Great American E&S Insurance Co.*, 454 F. Supp. 3d 180 (E.D.N.Y. 2020)—is unavailing. That court, applying New York law, determined that similar language applied by asking "whether the policies insure[d] the same property, the same interests, and against the same risk" and disclaiming any need to find "identity in minute particular[.]" *Id.* at 183 (quoting *Cont'l Ins. Co. v. Com. Union Ins. Co.*, 27 A.D.2d 333, 336 (N.Y. App. 1967)).

20

But Liberty Mutual offers no more support for its request that we engage in this inquiry at such a high level of generality. And doing so would require us to ignore the obvious differences in the conditions attached to each policy—thus giving little weight to the written words of the contracts. Tennessee courts would likely not accept that outcome. *See Individual Healthcare Specialists*, 566 S.W.3d at 694 (citations omitted). Besides, even if Tennessee courts would ask only whether the policies insure the same property, the same interests, and against the same risks, these policies cover different insureds with different interests against unique risks.

Because it is not clear that Liberty Mutual's policy was written specifically as excess, and the policies are not the same under Landmark's policy, neither is primary here. Rather, on their plain terms, both offer excess coverage.

That holding leaves us to determine how to allocate coverage between Landmark and Liberty Mutual. The Tennessee Supreme Court has held that when two policies are "mutually repugnant"—that is, when their other insurance clauses conflict—"the only reasonable result . . . is a proration between the two insurance companies in proportion to the amount of insurance provided by their respective policies." *United Servs.*, 414 S.W.2d at 841. Persuasive data in the form of two Tennessee Court of Appeals decisions, *see Shelter*, 930 S.W.2d at 573, and *Sentry Select*, 2021 WL 4352537, at *7, and the leading insurance treatise, *Couch on Insurance*, suggest that the Tennessee Supreme Court would continue to follow that approach today. *See* 15 *Couch* 219:47 ("Where two primary policies both contain excess 'other insurance' clauses, the excess clauses are generally treated as mutually repugnant and the loss is pro rated between the insurers."). Proration between Landmark and Liberty Mutual is appropriate here.

V.

As we conclude, a brief recap is due: No persuasive data convince us that the Tennessee Supreme Court would look to the lease between HECO and Heckethorn to resolve this allocation-of-coverage dispute. Likewise, no persuasive data convince us that the Tennessee Supreme Court has overruled its cases holding that pro rata coverage is the default where two "other insurance" clauses conflict with one another. And Landmark and Liberty Mutual's "other insurance" clauses do, in fact, conflict.

So what issues remain for remand? Mainly, the district court must determine how to prorate coverage. *See* 15 *Couch* 219:45 ("[E]ach insurer is responsible for the proportion of the loss that the face amount of its policy bears to the total amount of valid and collectible insurance."). But on top of that, it may also need to address the other defenses to coverage raised in Landmark's complaint—recall that its complaint included five more defenses. *See supra* at 6. Of course, the district court's grant of summary judgment in Landmark's favor made Landmark's other defenses unnecessary—until now.

In Landmark's motion for summary judgment, it addressed its remaining defenses. Landmark Summary Judgment Motion, R. 51, PageID 505 n.1. It would "pursue" them in another summary-judgment motion, "only if necessary, after adequate discovery." *Id.* We think it likely that the record below will require further development on the issues raised by Landmark. *Ohio St. Univ. v. Redbubble, Inc.*, 989 F.3d 435, 451 (6th Cir. 2021). And we trust that the district court can resolve them on remand.

VI.

For the reasons above, we reverse the district court's grant of summary judgment for Landmark and remand for further proceedings consistent with this opinion.